1

2

3

4                     UNITED STATES DISTRICT COURT

5                     EASTERN DISTRICT OF CALIFORNIA

6

7   EQUAL EMPLOYMENT OPPORTUNITY          1:06-CV-01251-OWW-GSA
    COMMISSION,
8                                         MEMORANDUM DECISION RE
                                          PLAINTIFF EEOC'S MOTION FOR
9                   Plaintiff,            SUMMARY ADJUDICATION (Doc. 37)
                                          AND DEFENDANT CALIFORNIA
10       v.                               PSYCHIATRIC TRANSITIONS,
                                          INC.'S MOTION FOR SUMMARY
11                                        ADJUDICATION (Doc. 40.)
    CALIFORNIA PSYCHIATRIC
12  TRANSITIONS, INC.,

13
                    Defendant.
14

15       This   case   involves   allegations   of   sexual   harassment,

16  retaliation, and constructive discharge at California Psychiatric

17  Transitions, Inc ("CPT").   Plaintiff Equal Employment Opportunity

18  Commission ("EEOC") alleges that CPT subjected a number of its

19  female employees to a hostile environment created by sexual and

20  gender harassment which culminated in adverse employment actions in

21  violation of Title VII of the Civil Rights Act of 1964 ("Title

22  VII").    Plaintiff   seeks   to   correct   these   alleged   unlawful

23  employment practices and obtain relief for Mareil Somera ("Somera")

24  and Valeria Soares ("Soares"), the charging parties.

25       Plaintiff EEOC seeks summary adjudication on the statutory

26  prerequisites for bringing a suit under Title VII.  CPT cross-moves

27  for summary adjudication, arguing that the EEOC has not satisfied

28

                                    1

Title VII's statutory prerequisites as to charging party Somera and those "women similarly situated." CPT also seeks summary adjudication on Somera's constructive discharge claim, Soares' retaliation and hostile work environment claims, and the EEOC's requests for punitive damages.

EEOC's motion for summary adjudication, filed on May 4, 2009, addresses whether it satisfied Title VII's statutory prerequisites to commence litigation on behalf of Soares, Somera, and similarly situated women.  (Doc. 37.)  The EEOC seeks summary adjudication that a prima facie case is established for: (1) Soares' hostile work environment and retaliation claims; (2) Somera's hostile work environment and constructive discharge claims; and (3) the aggrieved parties' hostile work environment claim.

CPT moved for summary adjudication on May 4, 2009.  (Doc. 40.) As to Somera, CPT argues that the EEOC's constructive discharge claim is barred on three grounds: 1) her EEOC charge was untimely; 2) the EEOC failed to provide notice and opportunity to conciliate on the discharge claim; and 3) Somera sought to be rehired after quitting and, therefore, was not constructively discharged.

As to Soares, CPT seeks to summarily adjudicate the following claims: 1) her sexual harassment claim fails as the harassing events she experienced did not rise to an actionable level; and 2) her retaliation claim fails because Soares did not engage in protected activity and the EEOC cannot demonstrate a pretextual dismissal.  CPT does not challenge that Somera meets Title VII's jurisdictional prerequisites.

CPT also moves to dismiss the EEOC's claims for punitive damages on behalf of Somera and Soares.

## II. **FACTUAL BACKGROUND**.

A.   **The Parties**

The EEOC is an independent federal agency created by Congress in 1964 to eliminate discrimination in workplaces across the United States.    The  EEOC  is  charged  with  the  administration, interpretation and enforcement of Title VII of the Civil Rights Act of 1964, and is expressly authorized to bring this action on behalf of Soares and Somera pursuant to §§ 706(f)(1) and (3).

Charging party Soares is a female employed by Defendant CPT from October 2003 to April 2004.    Soares was hired by CPT as a mental  health  worker  ("MHW").    Her  duties  included  counseling residents, daily charting, and monitoring symptoms for medical and behavioral changes.    Soares primarily worked the evening shift at the  re-entry  facility  and  was  supervised  by  Larry  Fuentes  and Barbara Kelly.

Charging party Somera is a female employed by Defendant CPT from February 2003 to December 2003.    Somera was hired by CPT as a dietary  aid  and  primarily  prepared  meals  for  CPT's  residents. Soares was one of five dietary aids supervised by Sherry Wall.

CPT operates a mental health rehabilitation facility in Delhi, California.  CPT contracts with the State of California and various other agencies to provide patients with residential mental health rehabilitation,  treatment,  and  long  term  care.    At  all  relevant times  herein,  CPT's  President  and  Medical  Director  was  John  T. Hackett, M.D. and its Facilities Director was James T. Drayton.    At all relevant times, CPT employed between 25 and 85 persons.   (Doc. 40, 2:12-2:13.)

3

CPT also employed Larry Fuentes, the focus of Soares and Somera's allegations.  Fuentes was CPT's lead MHW and worked the day shift in 2003 and 2004.  Fuentes was supervised by Barbara Kelly and remained employed at CPT throughout the tenures of Soares and Somera.

### 1.   CPT's Employee Manual

In 2001, CPT issued a comprehensive Employee Manual which remained in effect until revised in 2005.  (Drayton Dec. ¶7; Ex. B ("CPT Emp. Manual") at CPT 0314-0317.)  The Employee Manual is provided to all employees for review during the initial orientation period.  (*Id.*)  Copies are maintained at CPT and immediately accessible to all employees upon request.  (*Id.*)  The Employee Manual includes a policy statement regarding harassment in the workplace and the duties and responsibilities of CPT employees.  (*Id.*)  In addition, all employees receive sexual harassment training during orientation.  (*Id.*)  In-service training is provided on a regular and recurring basis. (*Id.*)

## B.  Events Leading up to Somera's EEOC Charge

Somera began working at CPT as a dietary aide on about February 6, 2003.  (Plaintiff's Statement of Disputed Facts (hereinafter "DF") 1).[1])  As part of Somera's orientation, Fuentes gave Somera a tour of the kitchen.  (DF 2.)  He showed her around

---

[1]   Reference to the document as a "Statement of *Disputed Facts*" is not entirely accurate.  CPT does not dispute the bulk of the "disputed facts."  To the extent they do, their objections are overruled, immaterial to the ultimate facts of the case, or discussed separately in Part III(A), *infra*.

**4**

the kitchen and to the walk-in refrigerator/freezer.   (DF 2.)
After showing Somera the freezer, Fuentes stopped in the exit door
and told her to stay there because he wanted to see her nipples get
hard.  (DF 2.)  He laughed and then proceeded to show her the rest
of the kitchen.  (DF 2.)

Over the course of Somera's employment, she alleges that
Fuentes engaged in a pattern of "obnoxious sexual behavior."
Somera states that Fuentes would stand behind her and thrust his
hips in a way suggestive of sexual intercourse.  (DF 3.)   This
behavior began about two or three weeks after Somera started at
CPT.  (DF 3.)  Fuentes also frequently grabbed his crotch in front
of CPT employees, including Somera.[2]  (DF 4.)

Somera complained to her supervisor, Sherry Wall, about
Fuentes' behavior during her orientation, and also about him
grabbing his crotch in front of her and others.  (DF 5.)  This was
consistent with CPT's policy, which directed employees to complain
to their direct supervisors.  (DF 6.)  Wall responded that Somera
should not worry, and that Wall would talk to CPT's Business
Manager, Donna McGowan, about it.  (DF 7.)  Between one and three
months after her first complaint, Wall told Somera that she had
told Donna McGowan about Somera's complaint, and asked Somera if
Fuentes had said or done anything else.  (DF 8.)  Somera responded
that Fuentes had come up from behind and thrust his hips simulating
sex.  (DF 8.)  Wall responded that she would talk either to McGowan
or Dr. Hackett. (DF 8).

---

[2]  Somera states that the crotch grabbing occurred more than
10 times, four of which she caught Fuentes in the act. (DF 3.)

1       Somera maintains that Fuentes' harassment escalated during her
2   employment.   According to Somera, Fuentes began bragging that he
3   had sex in the kitchen with another employee and that this
4   individual "gave good head" and "was a good lay."  (DF 9.)  Fuentes
5   also touched Somera's hips and asked her if she was wearing thong
6   underwear and, also, the color of her underwear.  (DF 10.)  Fuentes
7   also looked down her blouse when she bent over.  (DF 11.)   Wall
8   observed one such episode, and Wall assured Somera that she would
9   report it. (DF 12.)  Wall reported the episode to McGowan. (DF 13).

10      Fuentes also started wiggling his pierced tongue and remarked
11  that he could satisfy Somera's sexual desires.   (DF 15.) Somera
12  states she told him, "That's nasty," to which he would respond,
13  "Just kidding, girl, come on. You [are] just such a pussy." Somera
14  witnessed Fuentes engage in the same behavior with other female
15  workers and patients.   (DF 15.)   She never saw him wiggling his
16  tongue to men.   (DF 15.)

17      In late 2003, Somera received more responsibility in the
18  kitchen, including scheduling the staff and creating nametags for
19  the patients, both of which required her to use the computers
20  located on the second floor.  (DF 16.)  Fuentes left six or seven
21  love letters to her on the computer.  (DF 16.)  Fuentes also tried
22  to look down her blouse when she was seated at the computer, and
23  commented something to the effect of, "Shit, babe, you got nice
24  boobs," or "Girl, you have nice tits."  (DF 17.)

25      In September 2003, Somera complained to Wall that Fuentes was
26  touching her buttocks and asking her and other women if they were
27  wearing thong underwear.  (DF 18.)  In November 2003, Somera asked
28

Wall what was happening with her complaint about Fuentes.  (DF 21.) Wall later told her that she had brought Somera's complaints to the Director of Nurses, Barbara Kelly.  (DF 20.)   Around this same time, Donna McGowan or Kelly conveyed Somera's complaint about Fuentes to Drayton. (DF 21.)

As a result, Kelly interviewed Fuentes, informed him of the complaint, and admonished him to stay away from the kitchen. (Defendant's Statement of Undisputed Facts (hereinafter "DSUF") 58.)  Kelly also followed up with Somera.  (Id.; DF 22.)  According to CPT, Kelly offered Somera alternative work arrangements, but Somera declined the offer.   (DSUF 50.)   The EEOC disputes that Fuentes was disciplined as a result of Somera's complaints and that Kelly offered Somera an alternative work arrangement.   (DF 24.)

As a further result of the reported harassment, Drayton arranged for an in-service training on the subject of sexual harassment.  (DSUF 60.)  The sexual harassment training took place on November 20, 2003.  (DF 23; DSUF 8.)  The entire staff was at the training, including Fuentes. (DF 23.)

According to Somera, Fuentes was on the telephone instead of paying attention to the presentation.  (DF 24).  CPT disputes this. However, the parties agree that, following the in-service training, there were no further incidents of unwelcome sexual harassment by Fuentes toward Somera.[3]   (DF 25; DSUF 23.)

---

[3] Although Fuentes' unwelcome comments to Somera ceased, the record indicates that Fuentes' illicit behavior continued. Somera stated in her deposition that a few days after the in-service, Fuentes went behind a female employee and began thrusting his hips.  (Somera Dep. 144:-145:17.)  Several CPT

Thereafter, according to CPT, Somera told Mr. Drayton that she was quitting, but he convinced her to remain at CPT for two additional weeks.  (DSUF 14.)  In the meantime, Ms. Wall called and spoke with Ms. Somera and convinced her not to quit.   Shortly thereafter, Ms. Wall resigned and CPT appointed Latrice Wills, a more senior employee, to supervise the kitchen.  Somera resigned a few days later.[4]

CPT maintains, and the EEOC does not dispute, that Somera was overwhelmed by the additional responsibilities she assumed when Ms. Wall went on vacation.  (DSUF 11.)   CPT claims this led to her resignation.   CPT also asserts that Somera believed that her co-workers were jealous that she was appointed to a temporary supervisory position.  (DSUF 12.)  CPT states that her resignation involved in-fighting in the kitchen, CPT's decision to appoint another employee to kitchen supervisor, and continuing rumors that she and Mr. Fuentes had sex.  (DSUF 13, 15.)

 The dispute over Somera's departure appears limited to Wall's involvement.   Somera claims that she resigned after learning that Wall, whom she viewed as a protector, quit after a dispute over her sexual harassment allegations.  (DF 28.)  CPT denies this, stating that Wall's resignation was not related to Somera, and stemmed from

---

employees witnessed the incident.  (Id.)  Somera stated that "[h]e still does the same things, all those things that he did to me."  (Id.)

    [4]  Somera testified that "[t]he day that Sherry quit, I decided to quit. I wanted to quit with them."  (Somera Dep. at 168:9-169:17.)

**8**

1    reasons set forth above.[5]  (DSUF 11-15.)

2

3    **C.   Events Leading up to Soares' EEOC Charge**

4

5        **1. Background**

6        Soares began working at CPT as a mental health worker in

7    October 2003. (DF 30; DSUF 28.)  During orientation, Fuentes showed

8    Soares the facilities and introduced her to the staff and patients.

9    Fuentes, in Soares' presence, asked a male psychiatric patient, "I

10   bet you would like [Soares] to wash you in the shower, right?"  (DF

11   31; DSUF 28.)  Fuentes then asked the patient, "you like her ass,

12   don't you?"  (DF 31; DSUF 28.)

13       According to Soares, Fuentes repeatedly referenced his

14   decorative piercing and its use for the sexual satisfaction of his

15   partners.  (DF 32.)  Fuentes stated that it was "to please the

16   woman" and it made "women feel good."  (Soares Dep. 39:12-39:19.)

17   Fellow CPT employees also heard Fuentes' comments concerning his

18   tongue ring.  (*Id.*)  According to Soares, she relayed Fuentes'

19   comments to the nurses to whom she reported, Della McClendon and

20   Janice Monges.   (DF 33.)  CPT disputes this and argues that

21   McClendon and Monges were nurses and not in Soares's chain of

22   command.   CPT maintains that Soares did not report Fuentes'

23   orientation comments to CPT management.  (DSUF 30.)

24       At unspecified points in time throughout her employment,

25

26   ────────────

27       [5] The parties do not dispute that roughly a month later,
     Somera called CPT asking if she could return to her job.  (DSUF
28   17.)

                              **9**

Soares heard of Fuentes' sexual comments toward other CPT emloyees. One employee told Soares that "she had squatted down [and] Fuentes want to know, you know, what it looked like." (Soares Dep. 73:15-73:19.)   Charging Party Somera also told Soares of her experiences with Fuentes and his sexually-charged behavior.   Specifically, Somera told Soares of the freezer incident which occurred during her orientation.[6]

At some point in time during her employment, Soares testified in her deposition that Fuentes constantly used the word "pussy" to describe female employees. (DF 36.) CPT argues that the record identifies only two instances when Fuentes used the word to refer to someone in particular. (Doc. 56, Exh. G 162:13-163:21.)   First, in reference to a male employee, Bob Rice ("Don't be a pussy") and, second, following the shower incident, he referred to Soares as a "pussy" to a fellow employee.   Soares did not discover the latter incident until after her departure from CPT.

At some point in time during her employment, Fuentes displayed a calendar of near-naked women on his desk. (DF 37.) Fuentes asked Soares, "that doesn't offend you, does it?" (Soares Dep. 66:19-66:24.)   The parties agree that there was no further discussion between the two regarding the calendar.

According to Soares, the calendar was approximately 5x5 inches and was prominently displayed on his desk.   Fuentes' desk was located directly adjacent to the room where CPT held employee

---

[6]   The statements made by CPT employees to Soares are not offered to prove the truth of the matter asserted; rather the comments are admissible for their effect on the listener - here, Soares.  (See Fed R. Evid. §§ 801-802.)

meetings.   (Soares Dep. 67:3-67:12.)    Soares observed Fuentes' calendar every shift, either on the way to staff meetings or to work at the meeting table.   (Soares Dep. 67:10-67:12.)

According to CPT, the calendar was a "Sports Illustrated Swimsuit Calendar," and Soares viewed the swimsuit calendar on only one occasion in March 2004.   (Doc. 56, Exh. G, 69:15-71:3)   CPT also argues that Soares did not complain to Drayton about the calendar.   (DSUF 26.)

In March 2004, Soares was charting when a male patient named Kevin approached her and asked if she would accompany him outside so that he could have a cigarette. (DF 40; DSUF 33.) The patient did not like to shower as a general matter, and Soares told him that she would take him out for a cigarette if he agreed to shower first. (*Id*.) He agreed and she gave him his shower toiletries, which were kept under locks when not in use. He returned to Soares when he finished showering, and asked if she would take him outside for the cigarette. (*Id*.) According to Soares, Fuentes yelled from his position on the second floor words to the effect, "Kevin, you didn't take no shower." Soares replied, "He did, Larry. I gave him everything and he took a shower." Fuentes said, "You liar, you did not." Then Fuentes responded, "[w]ell, have Valerie smell your balls to see if you took a shower." Kevin responded, "That's messed up." Soares and Kevin then proceeded outside. (*Id*.)

The next day, Soares complained about the episode to McClendon, a nurse whom she considered to be one of her supervisors. (DF 42.) She explained that she had been offended by Fuentes' remark and also told McClendon that Fuentes' behavior

11

posed a threat to her: "If he says things like that to me in front of the male patients when I'm going in their rooms at night, sometimes by myself, they're not going to take me seriously and I could get hurt."  (DF 42.)

CPT states that McClendon was a day shift nurse and not Soares' supervisor.  (Soares Dep. 38:16-38:25.)  At that point, Mr. Fuentes was her immediate supervisor.  (*Id.*)  Soares did not report the shower incident to Ms. Kelly, Ms. Steele, Dr. Hackett, or Mr. Drayton.[7]  (DF 41.)

Soares also spoke with the charge nurse on the graveyard or "NOC" shift, David Baker, who had witnessed the episode.  (DF 43.) According to Soares, she raised concerns that Fuentes' behavior was putting her at personal risk, saying words to the effect that "if he makes me out to be a sexual thing with me and the male residents, at any one time going in their rooms, you know during the night, they may see me as that and do something, you know, be behind a door or what not if he keeps egging them on." (*Id*; Soares Dep., 57:20-59:2.)  Although Baker thought it was a violation of CPT's sexual harassment policy, he did not report the incident to management.  (Baker Dep. 48:2-48:25, 50:1-50:5.)  However, Baker told Soares that he would corroborate the incident if and when there was an investigation.  (Baker Dep. 50:17-50:24.)

CPT's sexual harassment policy at the time directed employees to report episodes of potential harassment to their immediate

[7] The next day Fuentes apologized to Soares for his inappropriate comments.  He did not report the incident to management.

supervisor or designated management representative.  Additionally, any employees who witnessed or learned of harassment were obligated to report the incident to their supervisor or manager.  (DF 45.) Baker never reported the episode to anyone else in CPT management or human resources.  (DF 44.)  CPT argues that Baker's supervisory duties were limited to conveying information regarding patient status during shift exchanges.

### 2. Complaints to the Department of Mental Health

The California Department of Mental Health received an anonymous report of the shower incident involving Soares, Fuentes, and the male patient.  (DF 47.)   The Department of Mental Health contacted CPT regarding the complaint and Drayton investigated it as a potential patient abuse episode. (DF 47.)  He spoke to the male psychiatric patient, Kevin, about the episode.   Kevin corroborated that it took place.  Drayton also spoke with Fuentes about it and Fuentes told Drayton that he had apologized to Soares and she was fine with it.   Drayton did not, however, speak with Soares about the incident. (DF 47.)

According to the EEOC, the Department of Mental Health received several anonymous complaints about Fuentes prior to the shower episode.   (DF 46.)   This is supported by Drayton's deposition testimony where he confirmed that Mr. Omoregie - the Department of Mental Health's representative - requested a "chronology" of sexual harassment complaints involving Larry Fuentes.  (Drayton Dep. 444:7-444:19.)  Mr. Omoregie told Drayton that the Department had received several complaints about Fuentes

on their hotline, some of a sexual nature, some of them involving patient care.[8]  (Id.)

### 3.  Soares' Attempts to Contact Drayton

According to Soares, she made several attempts to talk to Drayton following the shower incident.  (DF 48.)  Soares says she called and left messages for him with the secretary twice and slipped a note under his door informing him that she needed to see him.  (DF 48.)  It is undisputed that Soares never made contact with Drayton.

### 4. Events of April 9, 2004

In early April, Soares was transferred to the re-entry building.  (DF 49.)  At the time, the re-entry program was just being implemented, and there were only a few patients residing in the new building.  (DF 49.)  On the evening of April 9, 2004, CPT Systems Analyst Julie Steele visited the re-entry building.  (DF 49; DSUF 20).  The parties dispute what happened next.

According to CPT, Steele discovered Soares asleep on the evening of April 9, 2004. (DSUF 37.)  Around 11:00 p.m., Steele called Mr. Drayton and reported that she had discovered Ms. Soares asleep on the job working alone in the re-entry building with 22 patients.  (DSUF 37.)  According to Ms. Steele, she observed Ms.

---

[8] CPT responded to the Department's requests.  According to the EEOC, Drayton's response was incomplete; CPT did not disclose the orientation incident involving Somera and Fuentes.

Soares on the living room couch in the re-entry building, covered with a blanket and snoring.  Ms. Steele reported that Ms. Soares then resisted her attempts to discuss the situation and offer suggestions.  (Drayton Dep. at 34:6-37:17.)  Sleeping on the job is a critical patient safety issue, a strict violation of CPT policy and a condition of its State licensing.  (Doc. 41, Ex. A at CPT0321.)  Ms. Soares was aware of the policy.  (DSUF 36.)  Upon receiving this information Mr. Drayton made the decision to terminate Ms. Soares based on the gravity of the violation and rejection of Ms. Steele's suggestions.  (DSUF 38.)  At the end of her shift, the following morning, Ms. Soares was discharged.  (DSUF 39.)

According to Soares, Steele did not discover her sleeping on the night of April 9th.  (DF 49.)  Soares states that Steele entered the re-entry building about 15 minutes after her shift started. (DF 49.)  Soares was sitting on a couch reading a magazine.  (DF 49.)  The television was on and the few patients in that building were asleep.  (DF 49.) Steele entered from a door down the hallway, and the slamming of the door startled Soares.  (DF 49.)  Steele walked quickly down the hall to the nurses' "cage."  (DF 49.) Soares, who had never seen Steele at the facility at night before, assumed Steele was picking up some patient charts.  (DF 49.) Steele came back out and they had a brief discussion in which Soares expressed that she was a little bored in the new building, then Steele left.  (DF 49.)  The next day, Fuentes told Soares she was terminated. (DF 49).

The record reflects considerable dispute over whether CPT

15

uniformly enforced its sleeping policy.  (DF 60.)  According to David Baker, a CPT nurse, he often slept during his shift and observed other employees sleeping during their shifts, including Soares.  (Baker Dep. 65:2-67:25.)  Baker was unaware of any occasion where a shift employee was discovered sleeping by a supervisor.  (Baker Dep. 54:22-54:25.)

Further, the record indicates that Jamie, a former CPT employee, was not fired after he was caught sleeping during his shift.  (DF 61.)  Jamie was given several chances to improve his sleeping patterns before he resigned.  (DF 61.)

According to Soares, the only other employee fired for sleeping on the job was Johnny Montalvo.  (DF 62.)  According to Montavlo, CPT employees, including Fuentes, discovered Montalvo sleeping during his shift on a number of occasions.  (Montalvo Dep. 21:22-22:2.)  Montalvo was not disciplined for sleeping until the final incident, which occurred in August 2008.  (Montalvo Dep. 31:19-45:17.)  The last Montalvo sleeping incident resulted in a resident escaping the facility.  (*Id.*)

### 5. <u>Soares' Sexual Harassment Complaints</u>

Although she complained of Fuentes' comments to fellow CPT employees, it is undisputed that Soares did not file a harassment complaint or report any harassment to CPT management during her employment.  (DSUF 40, 45.)  This includes the orientation incident, Fuentes' references to "pussy", and the Sports Illustrated calendar.  (DSUF 42-43.)

It is similarly undisputed that Soares did not report the shower incident to Ms. Kelly, Ms. Steele, Dr. Hackett, or Mr. Drayton. (DSUF 41, 46.) However, Soares did report the incident to Nurse McClendon, Nurse Baker, and spoke with Fuentes, her direct supervisor, about his comments.

D.   **EEOC Involvement and Investigation**

     1.   **Ms. Soares**

In April 2004, Ms. Soares filed a discrimination charge with the EEOC against CPT. (Plaintiff's Statement of Undisputed Facts ("PSUF") 2.)  Soares alleged that she and other women were sexually harassed by Larry Fuentes during her employment at CPT.  (PSUF 2.)  Soares also stated that she was fired in retaliation for opposing the sexual harassment.  (PSUF 2.)

On May 4, 2004, the EEOC provided CPT with notice of Soares' discrimination charge. (PSUF 3.)  The notice was sent to Dr. John Hackett, Owner, California Psychiatric Services, and indicated the discrimination charge was based on "sex" and "retaliation." (Exh. 2)  The letter stated that "there is reasonable cause to believe that [CPT] discriminated against [Soares] and a class of similarly situated female employees based on their sex [...] and there is reasonable cause to believe [CPT] retaliated against [Soares]." The letter did not mention any other female employee and did not include specific evidence supporting the conclusion. (PSUF 14-15.)

     2.   **Ms. Somera**

On September 27, 2004, Somera filed a charge of discrimination

with the EEOC against CPT.  (PSUF 4.)  Somera alleged that she and other women were sexually harassed by Larry Fuentes, the harassment was "verbal and physical," and continued throughout her tenure at CPT.  (PSUF 4.)  Soares also stated that she complained about Fuentes to her supervisor Sherry Wall, but no action was taken and the harassment continued.  Somera did not allege retaliation or constructive discharge in her EEOC charge.  (PSUF 10.)

On October 14, 2004, the EEOC provided CPT with notice of the Somera's discrimination charge.  (PSUF 5.)  The notice was sent to Dr. John Hackett, Owner, California Psychiatric Services, and indicated "sex" as the basis for the discrimination charge.  (Exh. 4.)  The letter stated that "the evidence demonstrates that [Somera] and other similarly situated females were harassed," but did not include specific evidence supporting the conclusion.  (PSUF 12.)  The letter also did not mention any other female employee and did not include allegations of retaliation or constructive discharge.  (PSUF 11, 13.)

### 3.  EEOC's Investigation and Correspondence

Following notice of the charges, the EEOC investigated Soares' and Somera's discrimination claims.  (PSUF 6.)  As part of the investigation, the EEOC requested from CPT statements of position and copies of all documentation supporting its position.  (PSUF 6.)  The EEOC also conducted interviews with current and former CPT employees.  (PSUF 6.)

On September 1, 2005, the EEOC sent correspondence referencing

"Ms. Valerie Shaw"[9] to CPT in Delhi, California. The correspondence included EEOC's determination letter that Ms. Shaw and a class of females were subjected to harassment based on their sex and that the Charging Party was terminated for protected activity. The determination letter noted that EEOC "will contact you in the near future to begin the conciliation process."

The EEOC sent additional correspondence to CPT on September 1, 2005. The second letter referenced "Ms. Mariel Somera" and included EEOC's determination that Ms. Somera and a class of females were subjected to harassment based on their sex. The determination letter noted that EEOC "will contact you in the near future to begin the conciliation process."

Following the September 1, 2005 letters, the EEOC and CPT attempted to settle the discrimination claims made by Ms. Soares and Ms. Somera. (PSUF 8.) According to CPT, the EEOC offered to resolve the matter for $75,000. (PSUF 8.) CPT offered $15,000. (PSUF 8.)

On January 31, 2006 and February 22, 2006, the EEOC sent letters to CPT's legal counsel regarding Ms. Soares and Ms. Somera's claims. (PSUF 9.) The EEOC stated that "efforts to conciliate this charge as required by our procedures and policies have been unsuccessful" and it was forwarding the matter to its regional attorney for litigation review. (PSUF 9.) This case followed.

---

[9] Aka, Valerie Soares.

1

2

III.  **PROCEDURAL BACKGROUND**.

3       This action was filed on September 13, 2006, by Plaintiff

4 Equal Employment Opportunity Commission.   The complaint contained

5 several causes of action related to CPT's alleged discrimination,

6 harassment, and adverse employment actions.   (Doc. 1.)

7 Specifically, the complaint raised hostile work environment causes

8 of action on behalf of Mareil Somera, Valeria Soares, and similarly

9 aggrieved women.   The EEOC also raised a retaliation claim on

10 behalf of charging party Soares and a constructive discharge claim

11 on behalf of Somera.   The EEOC requested punitive damages.

12       On December 11, 2006, Defendant CPT filed an answer to the

13 complaint.   (Doc. 6.)

14       On May 4, 2009, the EEOC filed a motion for summary

15 adjudication on whether it satisfied Title VII's statutory

16 prerequisites to commence litigation on behalf of Soares, Somera,

17 and "similarly aggrieved parties."   (Doc. 37.)

18       CPT moved for summary adjudication on May 4, 2009.  (Doc. 40.)

19 As to Somera, CPT argues that the EEOC's constructive discharge

20 claim is barred on three grounds: 1) her EEOC charge was untimely;

21 2) the EEOC failed to provide notice and opportunity to conciliate

22 on the discharge claim; and 3) Somera sought to be rehired after

23 quitting and, therefore, was not constructively discharged.

24       As to Soares, CPT seeks summary adjudication on the following

25 claims: 1) her sexual harassment claim because the harassing events

26 she experienced did not rise to an actionable level; and 2) her

27 retaliation claim fails because Soares did not engage in protected

28 activity and the EEOC cannot demonstrate a pretextual dismissal. As

to Soares, CPT only challenges the merits of her claims;  CPT does not challenge Somera's satisfaction of Title VII's jurisdictional prerequisites.

Defendants also move to dismiss the EEOC's claims for punitive damages on behalf of Somera and Soares.

On June 12, 2009, the EEOC opposed CPT's motion for summary adjudication.  (Docs. 54-57.)  On June 15, 2009, CPT opposed the EEOC's motion for summary adjudication.  (Doc. 59.)

A.   Evidentiary Objections

Defendant objects to the Declarations of John Hackett, David Baker and Mariel Somera, submitted in support of the instant Motion for Summary Adjudication, on the ground that these witnesses lack personal knowledge, the cited testimony constitutes inadmissible hearsay and lacks foundation.  (Docs. 61, 68.)

Rule 56(e) of the Federal Rules of Civil Procedure requires that affidavits supporting and opposing a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters therein."

Hearsay is a statement, other than one made by the declarant, offered in evidence to prove the truth of the matter asserted.  Fed R. Evid. 801(c).  Hearsay is not admissible except as provided by the Federal Rules of Evidence, or other rules prescribed by the Supreme Court.  Fed R. Evid. 802.

CPT's objections are, in the majority, sustained.  In order to enforce the standards set forth in Federal Rules of Civil Procedure

and the Federal Rules of Evidence, the Court will simply disregard any portion of the testimony containing inadmissible hearsay, conjecture, speculation, or not made on the basis of his personal knowledge.  Any assertions made by Hackett, Baker or Somera that are not supported by the record, by a demonstration of personal knowledge or by corroborating evidence, are insufficient to establish a genuine issue of material fact.

To the extent that the statements are offered to prove the truth of the matter asserted, they are inadmissible.  <u>See</u> Fed R. Evid. §§ 801-802 ("Hearsay is not admissible except as provided by the Federal Rules of Evidence [...]").

## IV. <u>LEGAL STANDARDS</u>.

### A.   <u>Summary Judgment/Adjudication</u>

Summary judgment, or summary adjudication, is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  The movant "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Where the movant will have the burden of proof on an issue at trial, it must "affirmatively demonstrate that no reasonable trier

of fact could find other than for the moving party." *Soremekun v. Thrifty Payless*, Inc., 509 F.3d 978, 984 (9th Cir.2007).  With respect to an issue as to which the non-moving party will have the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case." *Soremekun*, 509 F.3d at 984.

When a motion for summary judgment is properly made and supported, the non-movant cannot defeat the motion by resting upon the allegations or denials of its own pleading, rather the "non-moving party must set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" *Soremekun*, 509 F.3d at 984. (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). "A non-movant's bald assertions or a mere scintilla of evidence in his favor are both insufficient to withstand summary judgment." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009).  "[A] non-movant must show a genuine issue of material fact by presenting *affirmative evidence* from which a jury could find in his favor." *Id*. (emphasis in original). "[S]ummary judgment will not lie if [a] dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.  In determining whether a genuine dispute exists, a district court does not make credibility determinations; rather, the "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id*. at 255.

23

**B.    Title VII**

Title VII of the Civil Rights Act makes it unlawful for employers to discriminate on the basis of sex with respect to the terms and conditions of employment. 42 U.S.C. 2000e-2(a)(1). The courts have held that discriminatory conduct includes harassment (*see e.g., Meritor Savings Bank v. Vinson*, 477 U.S. 57 (1986)) when that harassment occurs because of sex. *See Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 80-81 (1998) (stating that Title VII only prohibits harassment which occurs because of sex, regardless of whether the harasser is the same sex as or opposite sex from the victim).

Courts have recognized two legal theories on which plaintiffs may base sexual harassment claims.  The first is quid pro quo harassment, or harassment in which a supervisor requires an employee to engage in sexual activity and threatens tangible employment actions, such as demotion, denial of promotion, or discharge, if the employee does not comply with the harasser's demands.  The second is hostile work environment harassment.  This harassment can be perpetrated by a supervisor or coworker.   The hallmark of hostile work environment harassment is that there is no tangible employment action which results from the harassment. *See Burlington v. Ellerth,* 524 U.S. 742, 751-753 (noting that the terms "quid pro quo" and "hostile work environment" have been used in the courts to refer to sexual harassment and describe respectively, harassment that is accompanied by specific harm to the victim's job and harassment that harms an employee's job more generally, by creating a hostile work environment).

To survive a defendant's motion for summary judgment, as a

threshold matter, a plaintiff must show that the harassment occurred because of sex. *See Oncale v. Sundowner Offshore Services*, 523 U.S. 75, 80-81 (1998). In addition to this requirement, to state a prima facie case of hostile work environment sexual harassment a plaintiff must show that she has experienced (1) conduct of a sexual nature (2) that is so severe or pervasive as to alter the terms and conditions of her working environment and (3) that the conduct is unwelcome. *Harris v. Forklift Systems*, 510 U.S. 17 (1993); *Brooks v. City of San Mateo*, 229 F.3d 917, 924 (9th Cir. 2000); *Ellison v. Brady* 924 F.2d 872, 875 (9th Cir. 1991). The plaintiff's belief that she has been subjected to a hostile and abusive work environment must be both subjectively held and objectively reasonable. *Ellison*, 924 F.2d 872, 879 (9th Cir. 1991).

<u>**V. DISCUSSION**</u>.

To determine the scope of the actions that may be considered as part of the EEOC's case, the first inquiry addresses the administrative filing requirements of Title VII.

**A. <u>Conditions Precedent</u>**

Title VII allows the EEOC to commence civil suits in its own name. 42 U.S.C. § 2000e-5(f)(1). There are four conditions precedent, before the agency brings suit. First, a charge of discrimination must be filed. The EEOC must then inform the alleged wrongdoer of the charge, conduct an investigation, and determine whether reasonable cause exists to believe that the charges are true. If reasonable cause is found, the agency must

1  engage in conciliation efforts. *EEOC v. Pierce Packing Co.*, 669
2  F.2d 605, 607 (9th Cir. 1982).

3  The EEOC argues that it has met all jurisdictional
4  requirements to file this action on behalf of Soares, Somera, and
5  the class of similarly situated women. CPT disagrees, in part.
6  CPT argues that the EEOC has not fulfilled Title VII's statutory
7  prerequisites as to: (1) the timeliness of Somera's administrative
8  charge; (2) the notice and conciliatory regarding Somera's
9  constructive discharge claim; and (3) the notice and conciliatory
10 requirements regarding the class claim.

11

12      1.   <u>Charging Party Soares</u>

13      The EEOC moves for summary adjudication as to whether it
14 satisfied the jurisdictional prerequisites to bring suit on behalf
15 of charging party Soares.  CPT does not oppose the motion.  Here,
16 Soares filed her EEOC Charge on April 26, 2004 and the EEOC
17 provided CPT with notice of the Soares Charge in May 2006. The
18 Soares Charge states that Soares was sexually harassed by her
19 supervisor, Larry Fuentes, from the time of her hire on about
20 October 16, 2003 (192 days before she filed her charge) until her
21 termination on about April 10, 2004. Because the entire period of
22 Soares' employment falls within the 300 day limitations period,
23 there can be no dispute that her charge was timely.

24      The record also reflects that the EEOC investigated Soares'
25 claims and attempted to settle the matter prior to bringing suit.
26 The EEOC's efforts satisfy Title VII.

27      The EEOC's motion for summary adjudication as to whether it
28 satisfied the conditions precedent to bring suit on behalf of

charging party Soares is GRANTED.

    **2.   Charging Party Somera**

        a.   *Untimely Administrative Charge*

    CPT argues that Somera's claim is untimely because the last
discriminatory act against her took place more than 300 days from
the date on which Somera filed her charge of discrimination.

    A plaintiff must file a timely charge of discrimination with
the EEOC as a prerequisite to bringing suit under Title VII.   42
U.S.C. § 2000e-5(e).   Title VII requires that a complainant file a
charge with the EEOC within 180 days after the last act of alleged
discrimination,   unless   the   alleged   violation   occurred   in   a
jurisdiction that has a "work-sharing" agreement.   *Id*.   California
is a "work-sharing" state with a state agency capable of affording
relief, that is, the California Department of Fair Employment and
Housing,   thus   the   period   for   filing   a   charge   of   employment
discrimination with the EEOC can be 300 days.   *Santa Maria v.
Pacific Bell*, 202 F.3d 1170, 1176 (9th Cir. 2000).

    In a Title VII suit, a charge filed after the period has run
is untimely and cannot be the basis of a suit.   *Roberts v. Gadsden
Memorial Hosp.*, 835 F.2d 793, 799 (11th Cir. 1988).   Failure to
file an EEOC charge within the prescribed 300-day period is not a
jurisdictional bar, but it is treated as a violation of a statute
of limitations, complete with whatever defenses are available to
such   a   violation,   such   as   equitable   tolling   and   estoppel.
*Valenzuela v. Kraft, Inc.*, 801 F.2d 1170, 1174 (9th Cir. 1986).

    The timing - or lack thereof - of Somera's claim is not in
dispute.   Somera, a CPT employee from February 2003 until December

                                27

2003, stated in her deposition that the last act of alleged discrimination against her took place on November 20, 2003. The 300-day time limit thus commenced on that day and expired on September 15, 2004. It is undisputed that Somera did not file a charge with the EEOC until September 27, 2004, more than the 300 days after last act of alleged discrimination.

While the EEOC does not contest the untimeliness of Somera's charge, it argues that Somera is entitled to rely on the earlier EEOC charge filed by Soares to satisfy the 300-day statutory prerequisite.[10] The EEOC contends that because Soares' charge was timely and brought on behalf of "Soares and any other similarly situated women," it provided the EEOC with a sufficient jurisdictional foundation to bring a suit on Somera's behalf. This is known as the "single filing" rule or "piggybacking." *Holowecki v. Fed. Express Corp.*, 440 F.3d 558, 564 (10th Cir. 2006).

Although the Ninth Circuit has not specifically addressed the issue,[11] the single filing rule has been applied under various

---

[10] It is undisputed that Soares' administrative charge was timely. (PSUF 1-14.)

[11] There is some indication that the Ninth Circuit has declined to adopt the rule. *See Inda v. United Air Lines*, 565 F.2d 554, 559 (9th Cir. 1977) ("if one brings suit on his own behalf, or as a named plaintiff on behalf of a class, he must have secured a right to sue by timely following the procedures set forth in Title VII."). However, to the extent such language in *Inda* is not dicta, it has been restricted to its facts where a plaintiff sought to rely on an administrative charge of an individual employee in a separate action, and where the EEOC charge did not give sufficient notice that other similarly-situated persons would also be affected. *See Dukes v. Wal-Mart Stores Inc.*, 2002 WL 32769185, at *5 (N.D. Cal. Sept. 9, 2002) (limiting Inda's application); *see also White v. BFI Waste Services, LLC*, 375 F.3d 288, 293-94 (4th Cir. 2004) (observing

circumstances by the Second, Fifth, Sixth, Seventh, Eighth, Tenth, and Eleventh Circuits. *See Anson v. Univ. of Tex. Health Science Center*, 962 F.2d 539, 541 (5th Cir. 1992) (The single filing rule is "universally [held]."); *Foster v. Ruhrpumpen, Inc.*, 365 F.3d at 1197 (10th Cir. 2004); *Anderson v. Unisys Corp.*, 47 F.3d 302, 308 (8th Cir. 1995). Most courts have adopted a test requiring only that the timely exhausted claims and the non-exhausted claims arise out of the same circumstances and occur within the same general time frame. *See e.g., Stone v. First Union Corp.*, 371 F.3d 1305, 1311 (11th Cir. 2004).

A charge will be adequate to support piggybacking under the single filing rule if it contains sufficient information to notify prospective defendants of their potential liability and permit the EEOC to attempt informal conciliation of the claims before a lawsuit is filed. *Howlett v. Holiday Inns, Inc.*, 49 F.3d 189, 195 (6th Cir. 1995). To determine the adequacy of a charge for use in piggybacking subsequent plaintiffs, courts often look to the size and type of the work unit involved. *Id*. "[M]ere similarity of the grievances within the same general time frame suffices to permit the 'single filing rule'" when the complaints "arise in a work unit of modest size." *Id*. (*quoting Tolliver v. Xerox Corp.*, 918 F.2d 1052, 1058 (2d Cir. 1990)).

CPT argues that Somera is not "similarly situated" to Soares,

_____

that the single-filing rule allows plaintiffs who have not exhausted administrative filing requirements to join in a lawsuit with other plaintiff, as opposed to bringing a separate suit on their own behalf). Because Soares' EEOC charge gave notice of other similarly situated individuals, *Inda* would not prevent application of the single-filing rule.

to prevent the single filing rule from relieving the tardiness of Soares' complaint. CPT asserts that Somera's claims differ from Soares' claims in that they focus on complaints to supervisors while Soares' claims focus on complaints to co-workers. Further, CPT argues that Somera and Soares held different jobs, worked different shifts, and had different supervisors. CPT contends this creates a genuine issue of material fact as to the charging parties relatedness and supports a denial of the EEOC's motion for summary adjudication.

CPT's arguments are unpersuasive. The EEOC has adequately shown that the individual claims of charging parties arose out of similar alleged sexually harassing treatment by the same individual, who allegedly created a constant environment of sexually offensive conditions for female employees, during the same timeframe.[12] Somera and Soares both assert that they were discriminated against on the basis of their sex by Larry Fuentes, a fellow CPT employee, from 2003-2004.[13] The parties' claims need not be factually identical to those timely filed, but instead need to be sufficient similarity as to prevent frustration of Title VII policies. *See Trbovich v. Ritz-Carlton Hotel Co.*, 920 F. Supp. 1030 (E.D. Mo. 1995).

The relatedness of the Soares and Somera's claims is best illustrated by their EEOC charges, filed by Somera on September 27, 2004 and Soares on April 26, 2004, respectively. Like Soares'

---

[12] The relevant timeframe is February 2003 to April 2004. See Part II(A), "Parties", discussed *supra*.

[13] Relatedness is magnified based on CPT's size: it is a mid-size company employing 25-85 people. (Doc. 40, 2:12-2:13.)

charge, Somera's charge described in detail the allegedly harassing conduct, such as Larry Fuentes' sexually explicit comments, his sexual epithets, and his inappropriate touching.   Soares' charge also described the nature of the harassment and notice that Larry Fuentes was harassing other CPT employees.   Soares' charge provided, for instance, that "I and other women were subjected to sexual harassment by Supervisor Larry Fuentes [...] he was constantly making gross sexual statements." (Doc. 37, Exh. 1.) Moreover, Somera's charge stated that "Manager Larry Fuentes sexually harassed me and other female employees.   The harassment was of a verbal and physical nature, and was constant." (Doc. 37, Exh. 3.)

CPT relies on *Arrieta v. Yellow Transp., Inc.*, 2008 U.S. Dist. LEXIS 101502 (N.D. Tex. 2008), to assert that the parties are not similarly situated. *Arrieta* is factually distinguishable.   Unhlike this case, the charging party in *Arrieta* did not provide any evidence supporting relatedness.   *Arrieta* found:

> [Plaintiff's] argument consists primarily of the conclusory statements that he is similarly situated to the other plaintiffs and that their charges provided some notice to YTI of the collective nature of their charges. He does not offer any explanation or argument to show how he is similarly situated to the other plaintiffs or how their charges provided the requisite notice to YTI.   Given the purpose of the exhaustion requirement and the limited nature of the piggybacking exception, a plaintiff may not simply assume that his independent, non-exhausted claims can be supported by the independent claims of others.

*Arrieta* at *79-*80.

CPT's reliance on *Arrieta* misses the mark.   Because of the similarity of Soares' and Somera's EEOC charges, CPT had notice

1  regarding the relatedness of their sexual harassment allegations
2  against the same individual, which were ignored by CPT's
3  management.  *Arrieta* is distinguishable.

4      Here, the requirements of the single filing rule are met.
5  CPT's unsupported assertions that the parties are not "similarly
6  situated" are not enough to create a genuine issue of material
7  fact.  Although Somera's charge was untimely, the EEOC has met its
8  Rule 56 burden and demonstrated, as a matter of law, that the
9  individual claims of the charging parties arose out of similar
10 alleged harassing treatment to enable use of the "single filing"
11 exception.

12     CPT does not oppose presence of the remaining jurisdictional
13 prerequisites regarding the EEOC's ability to bring a hostile work
14 environment claim on Somera's behalf.  Somera can "piggyback" on
15 Soares' earlier EEOC charge, making her charge timely.  The record
16 reflects that the EEOC investigated Somera's claims, provided CPT
17 with a letter of determination, and attempted to settle the matter
18 prior to bringing suit.  The EEOC's efforts satisfy Title VII.

19     The EEOC motion as to whether it satisfied the conditions
20 precedent to bring a hostile work environment claim on behalf of
21 charging party Somera is GRANTED.  CPT's contrary motion for
22 summary adjudication is DENIED.

23

24     B.  *Somera's Constructive Discharge Claim*

25

26     CPT contends that Somera's constructive discharge claim was
27 not within the scope of her EEOC charge and is not actionable.  CPT
28 states that the EEOC "never provided notice to CPT" and "never

considered or investigated Ms. Somera's voluntary resignation as a constructive discharge flowing from allegations of sexual harassment." The EEOC counters that the claim of "constructive discharge constitutes an additional consequence of the conduct alleged in the charge" and is permissible. Both parties move for summary adjudication on the issue.

Analysis of this issue begins with an examination of the prerequisites to suit by the EEOC and the scope of claims the EEOC is empowered to assert. In *EEOC v. Shell Oil Co.*, 466 U.S. 54, 80 L. Ed. 2d 41, 104 S. Ct. 1621 (1984), the Supreme Court explained the EEOC's enforcement procedure as follows:

> In its current form, Title VII sets forth "an integrated, multistep enforcement procedure" that enables the Commission to detect and remedy instances of discrimination. See Occidental Life Insurance Co. v. EEOC, 432 U.S. 355, 359, 97 S. Ct. 2447, 2450, 53 L. Ed. 2d 402 (1977). The process begins with the filing of a charge with the EEOC alleging that a given employer has engaged in an unlawful employment practice [....]
>
> [The statute] require[s] the Commission to "serve a notice of the charge (including the date, place and circumstances of the alleged unlawful employment practice) on [the] employer . . . within ten days" of the filing of the charge. 42 U.S.C. § 2000e-5(b).
>
> After a charge has been filed, the EEOC conducts an investigation of the allegations contained therein. . . . If, after completing its investigation, the EEOC determines that there is "reasonable cause to believe that the charge is true," it must "endeavor to eliminate [the] alleged unlawful employment practice by informal methods of conference, conciliation, and persuasion." § 2000e-5(b). If those methods prove ineffectual, the Commission is empowered to bring a civil action against the employer. § 2000e-5(f)(1).

In the course of this procedure, a "reasonable cause" determination by the EEOC is critical:

1
2
3
4
5
6
7
8
9
10

> The statute directs the EEOC to notify the
> respondent of the charge within 10 days, to
> investigate the charge, and to determine "as
> promptly as possible and, so far as practicable,
> not later than one hundred and twenty days from
> the filing of the charge" whether there is
> reasonable cause to believe that the charge is
> true. 42 U.S.C. § 2000e-5(b). If the EEOC finds
> no reasonable cause, then it must dismiss the
> charge. See id. If it finds reasonable cause,
> then  it must attempt to resolve the dispute "by
> informal methods of conference, conciliation, and
> persuasion." Id. "If within thirty days after a
> charge is filed . . . the Commission has been
> unable to secure from the respondent a
> conciliation agreement acceptable to the
> Commission, the Commission may bring a civil
> action against any [non-governmental] respondent.
> . . ." Id. § 2000e-5(f)(1).

11   *Martini v. Federal Nat'l Mortgage Ass'n*, 178 F.3d 1336, 1340 (D.C.

12   Cir. 1999).   Thus, following investigation, a determination that

13   "reasonable cause" is lacking ends the EEOC's procedures, while a

14   determination that there is "reasonable cause" initiates the

15   conciliation process, and also opens the door to suit by the EEOC,

16   if conciliation fails.   *EEOC v. Occidental Life Ins. Co.*, 535 F.2d

17   533, 541-542 (9th Cir. 1976).

18        The Ninth Circuit adopted the reasoning of other courts on the

19   importance of a reasonable cause determination and conciliation as

20   prerequisites to suit by the EEOC.   *Id.*; *see also EEOC v. Pierce*

21   *Packing Co.*, 669 F.2d 605, 608 (9th Cir. 1982) ("Genuine

22   investigation, reasonable cause determination and conciliation are

23   jurisdictional conditions precedent to suit by the EEOC.")

24        Turning to the scope of the claims the EEOC may assert,

25   admittedly, once the EEOC decides to sue in its own name, it is not

26   limited to the facts presented in the charge.   *EEOC v. Farmer*

27   *Bros.*, 31 F.3d 891, 899 (9th Cir. 1994).   Rather, the EEOC may sue

28   based on any violations that fall within the scope of the EEOC's

actual investigation, or are "like or reasonably related to" the allegations made before the EEOC, such that they would have been included within the scope of an EEOC investigation. *Id.*; *see also Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990) ("The jurisdictional scope of a Title VII claimant's court action depends upon the scope of both the EEOC charge and the EEOC investigation."). However, as this statement indicates, the EEOC's power to sue depends upon ascertainment of a violation, in other words, upon a "reasonable cause" determination that a violation has occurred.

In *EEOC v. Hearst Corp., Seattle Post-Intelligencer Div.*, 553 F.2d 579 (9th Cir. 1976), a gender discrimination case, the Ninth Circuit explained:

> [S]o long as discovery of the new discrimination arises out of the reasonable investigation of the charge filed, it can be the subject of an EEOC 'reasonable cause' determination to be followed by an EEOC offer of conciliation and, if conciliation fails, by a civil suit – without the filing by EEOC of a separate charge on the new claim.
>
> In other words, the original charge is sufficient to support EEOC administrative action, as well as an EEOC civil suit, for any discrimination stated in the charge itself or discovered in the course of a reasonable investigation of that charge, provided such additional discrimination was included in the EEOC 'reasonable cause' determination and was followed by compliance with the conciliation procedures of the Act.

*Hearst* at 580-581.[14])

---

[14] In *Hearst Corp.*, the Ninth Circuit noted that it was not departing from its decision in *Oubichon v. North American*, 482 F.2d 569 (9th Cir. 1973) – a private Title VII suit, holding that when an employee seeks judicial relief for incidents not listed in his original EEOC charge, the judicial complaint may encompass

1

2           **Here, the original charge by Somera alleged that she and other**

3     **women were sexually harassed by Larry Fuentes, the harassment was**

4     **"verbal and physical," and continued throughout her tenure at CPT.**

5     **Somera's charge did not allege constructive discharge, retaliation,**

6     **or otherwise mention her exit from CPT.   Thereafter, the EEOC**

7     **commenced its investigation into Somera's claims, which included**

8     **interviewing witnesses and requesting documents.**

9           **The EEOC issued a letter of determination regarding Somera's**

10    **claims on September 1, 2005.   The letter stated that "[b]ased on**

11    **the evidence of record, there is reasonable cause to believe that**

12    **Respondent discriminated against Charging Party and a class of**

13    **similarly situated female employees based on their sex, female, in**

14    **violation of the statute."   The letter mentions only Somera's**

15    **gender discrimination claims; it did not mention Somera's departure**

16    **from CPT and did not find that there is reasonable cause to believe**

17    **that CPT constructively discharged Somera.[15]**

18          **The EEOC argues that the base charge of sexual harassment puts**

19    **CPT on notice of the constructive discharge claim, and that "as**

20    **long as the EEOC's finding of harassment is clear, the notice need**

21    **not detail every consequence of the harassment."  (Pl.'s reply, pg.**

22

23    _____

24    any discrimination "like or reasonably related to the allegations
      of the EEOC charge ...."

25        [15] The particularity of Somera's letter stands in contrast

26    to Soares' letter.  Soares' letter states that "Charging Party
      also alleges that she was retaliated against for engaging in

27    protected activity" and "there is reasonable cause to believe
      Respondent retaliated against Charging Party, in violation of

28    statute."  (Doc. 56, Exh. M, EEOC 00003.)

8.)   The EEOC cites *EEOC v. Newton Inn Assoc.*, 647 F. Supp. 957 (E.D. Va. 1986)., in support of its argument.   However, Newton is distinguishable.

In *Newton*, the charging parties filed charges with the EEOC alleging gender discrimination.   The EEOC conducted an investigation and issued letters of determination stating it found reasonable cause to believe the charging parties were subjected to sexual harassment and retaliation.   Following failed conciliation efforts, the EEOC filed a lawsuit alleging, among other things, sexual harassment, retaliation, and constructive discharge. Defendant moved to dismiss the constructive discharge claim arguing that it is outside the scope of the original administrative charge and subsequent EEOC investigation.   The court held that the constructive discharge claim "logically flowed" from the substance of the initial administrative charge because the EEOC had determined that the charging parties and at least six other female associates were reassigned to a less desirable shift.   The court found that the constructive discharge claims - tacked onto the same charging parties' retaliation claims - broadened the scope "only minimally."

Here, unlike Newton, the EEOC's complaint does not refer to an earlier retaliation claim made by the charging party.   In fact, Somera did not allege constructive discharge or include any facts relating to her resignation.   In *Newton*, the EEOC also notified the employer - during conciliation discussions - that compliance would require "reinstatement and back wages for five additional individuals allegedly constructively discharged [...]".   There is no such notice by the EEOC to the employer in this case.

The EEOC states that specific notice of the constructive discharge claim is not required because "a constructive discharge predicated upon harassment does not provide a new theory of discrimination." (Pl.'s Rep. 7:24-7:28.) This is not accurate. *See Herron v. DaimlerChrysler Corp.*, 388 F.3d 293, 303 (7th Cir. 2004)(finding that Plaintiff could not sustain his Title VII constructive discharge claim because it was not "like or reasonably related" to the original EEOC charge, which described only racial discrimination and harassment*.); Zartman v.Coffey County Hospital*, 2004 WL 877667 (D. Kan. 2004) (finding that Plaintiffs were not entitled to pursue a constructive discharge claim because it was not "similarly situated" to claims of hostile work environment and retaliation.); *Tupua v. Hawaii, Dept. of Health,* WL 1561578 (D. Haw. 2009) (finding that treatment on the job and constructive discharge are separate and distinct discriminatory events.); *Harvill v. Westward Communications, LLC*, 311 F. Supp. 2d 573 (E.D. Tex. 2004)(stating that "[c]onstructive discharge, however, does not grow out of harassment allegations.").

*Harvill* is instructive. In *Harvill*, Defendants moved for summary judgment on Plaintiff's constructive discharge claim because Plaintiff's EEOC charge did not include a claim for constructive discharge. Plaintiff first introduced a claim for constructive discharge in her complaint. The Defendants argued it fell outside the scope of her EEOC charge. In granting Defendant's motion, the Harvill court stated:

> It is undisputed that Harvill did not assert constructive discharge in her charge. The charge only contains harassment allegations regarding the terms and conditions of Harvill's employment. Constructive discharge, however, does not grow

1

2

out of harassment allegations.

*Harvill* at 585.

Without more, allegations of sexual harassment do not provide a foundation for constructive discharge claims. Constructive discharge ends the employer/employee relationship and requires the plaintiff to demonstrate that "a reasonable person in the plaintiff's position would have felt he or she was forced to quit because of intolerable or discriminatory work conditions." *Wallace v. City of San Diego*, 479 F.3d 616, 626 (9th Cir 2007). This differs dramatically from sexual harassment's posture and required elements.[16]

The EEOC presents no evidence that they considered or investigated Somera's resignation as a constructive discharge flowing from her sexual harassment allegations. If the EEOC was squarely presented with the issue of constructive discharge - which allegedly occurred ten months prior to Somera's EEOC charge and two years prior to the EEOC's LOD -, why did they limit a reasonable cause determination to Somera's allegation of gender discrimination? Whatever the reason, we arrive at the same point:

---

[16] 29 C.F.R. § 1604.11 states: "Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment."

the EEOC did not find reasonable cause to include allegations of constructive discharge.[17]

While mindful of enforcing "form over substance," the EEOC's lack of a reasonable cause finding is conspicuous.  It provides a basis for conciliation and, if those efforts fail, permits the EEOC to initiate litigation.[18]  By failing to provide any notice to CPT of the constructive discharge claim - whether in the form of the EEOC charge, factual findings, or the LOD - the EEOC circumvents its "investigatory and conciliatory role, as well as deprive[s] the charged party of notice of the charge." *B.K.B. v. Maui Police Dept.*, 276 F.3d 1091, 1099 (9th Cir. 2002)(quoting *Babrocky v. Jewel Food Co.*, 773 F.2d 857, 863 (7th Cir.1985)).  Consistent with

---

[17] *EEOC v. Hearst Corp., supra,* addresses an original charge that alleged only discrimination against males.  The subsequent EEOC findings, based on evidence revealed during its investigation, included discrimination, not only as to males, but also as to females and members of minority groups.  The EEOC formally notified the employer of these findings and the EEOC issued its "Determination of Reasonable Cause," which included the additional claims of discrimination.  The parties proceeded to conciliation efforts on all the issues.  Conciliation eventually failed and the EEOC initiated litigation.  On appeal, the Ninth Circuit ruled that because "defendant has received adequate notice of the new charge during the administrative proceedings," the EEOC's allegations of gender and race discrimination were proper.  Here, the EEOC never notified CPT of the constructive discharge claim, thus distinguishing it from the typical situation where "the complaint may encompass [...] new acts occurring during the pendency of the charge before the EEOC." *Gen. Tel. Co. Of the N.W. v. EEOC*, 446 U.S. 318, 331 (1980).

[18] In *Seymore v. Shawver & Sons, Inc.*, 11 F.3d 794, 799 (10th Cir. 1997), the Tenth Circuit stated: "[W]here a retaliatory act occurs prior to the filing of a charge and the employee fails to allege the retaliatory act of a retaliation claim in the subsequent charge, the retaliatory act ordinarily will not reasonably relate to the charge."

1    case law and the purposes of Title VII, notice to CPT regarding the

2    constructive discharge claim was required to maintain such a claim

3    on Somera's behalf.

4         In this case, the EEOC's lack of a reasonable cause finding is

5    fatal to EEOC's pursuit of a constructive discharge claim on

6    Somera's behalf.   Even if the constructive discharge claim is

7    factually related to the substance of the sexual harassment claim,

8    Somera did not include the constructive discharge claim in her EEOC

9    charge and the EEOC did not include the allegations of constructive

10   discharge in its reasonable cause determination.   Title VII's

11   jurisdictional standards preclude a constructive discharge claim in

12   this case.

13        Summary adjudication is GRANTED in favor of CPT regarding the

14   EEOC's ability to bring a constructive discharge claim on Somera's

15   behalf.   The EEOC's cross-motion in this regard is DENIED.

16        Given this ruling on Somera's constructive discharge claim, it

17   is unnecessary to decide the motions regarding conciliation on

18   constructive discharge.   The EEOC's and CPT's motions on this issue

19   are DENIED as MOOT.

20

21        C.   *Conclusions Re Charging Party Somera*

22             1. Hostile Work Environment Claim

23        Somera can "piggyback" on Soares' earlier EEOC charge, making

24   her charge timely.    CPT did not challenge the remaining

25   jurisdictional prerequisites to EEOC's ability to maintain a

26   hostile work environment claim on Somera's behalf.   The record

27   reflects that the EEOC investigated Somera's claims, provided CPT

28   with a letter of determination, and attempted to settle the matter

41

prior to bringing suit.   The EEOC's efforts satisfy Title VII.

EEOC's motion whether it satisfied the conditions precedent to bring a hostile work environment claim on behalf of charging party Somera is GRANTED.   CPT's motion for summary adjudication on this issue is DENIED.


### 2.   Constructive Discharge Claim

The EEOC's lack of a reasonable cause finding is fatal to the EEOC's assertion that it can pursue a constructive discharge claim on Somera's behalf.   Title VII's jurisdictional standards preclude a constructive discharge claim in this case.

Summary adjudication is GRANTED in favor of CPT regarding the EEOC's constructive discharge claim on Somera's behalf.   The EEOC's motion in this regard is DENIED.


### 3. Similarly Aggrieved Parties

CPT claims that the EEOC has not satisfied the notice and conciliation prerequisites to proceed with the class claims.[19] According to CPT, it was not properly notified of the pattern-or-practice allegations against it.   In addition, CPT asserts it was not informed of either the identity of the claimants or the facts underlying their claims at any stage during the administrative

---

[19] To remedy any confusion on this point, the term "similarly situated female employees" is referred to as in the relevant part of Title VII: "allegedly aggrieved persons." See 42 U.S.C. § 2000e-5(f)(1) (referring to "[t]he person or persons aggrieved" and "the person aggrieved"). "Similarly situated female employees" are not referred to as "class members."

process, and was therefore denied an opportunity to engage in "conciliation." (Def.'s Opp. Pg. 11.)  CPT concludes, EEOC's claim on behalf of similarly aggrieved persons must fail.

   a. *Notice*

  Title VII grants the EEOC authority "to investigate and act on a charge of a pattern or practice of discrimination, whether filed by or on behalf of a person claiming to be aggrieved or by a member of the Commission." *EEOC v. Jillian's of Indianapolis, IN, Inc.*, 279 F. Supp. 2d 974; 42 U.S.C. § 2000e-5(f).  The EEOC may institute a "pattern-or-practice" case on its own initiative, i.e., by the filing of a Commissioner's charge.  Such cases must "be conducted in accordance with the procedures set forth in [42 U.S.C. § 2000e-5]." Id.

  As explained in Part V(1), *supra*, jurisdiction exists over any discrimination claims "that are alike or reasonably related to the allegations made in the EEOC charge[s], or that fall within the 'EEOC investigation which can reasonably be expected to grow out of the charge[s] of discrimination.'" *Deppe v. United Airlines*, 217 F.3d 1262, 1267 (9th Cir. 2000); *see Gen. Tel. Co. of the N.W. v. EEOC*, 446 U.S. 318, 331, 100 S. Ct. 1698, 64 L. Ed. 2d 319 (1980) ("Any violations that the EEOC ascertains in the course of a reasonable investigation of the charging party's complaint are actionable.").  The EEOC may, to the extent warranted by an investigation reasonably related in scope to the allegations of the underlying charge, seek relief on behalf of individuals beyond the charging parties who are identified during the investigation." United Parcel Serv., 94 F.3d at 318 (citing Cheek, 31 F.3d at 500);

43

The evidence in this case demonstrates the following:  The two original charges alleged sexual harassment by a employee at CPT's Delhi facility and retaliation by Soares.  (DSUF 1-4; Doc. 37, Exh. 1 & 3.)  Somera asserted in her charge that the "I and other women were subjected to sexual harassment."  (*Id*.)  Soares stated in her charge that the employee "sexually harassed me and other female employees" and "constantly stared at the buttocks of female employees, including my buttocks."  (*Id*.)  The charges filed by Soares and Somera mention Larry Fuentes by name, alleging that he had verbally sexually harrased them and fellow CPT employees "  (*Id*.)  The EEOC's LOD letters further provided that there was reasonable cause to believe that CPT discriminated against each of them and a class of allegedly aggrieved persons based on their sex.  (Doc. 37, Exh. 6 & 7.)

The EEOC's sexual harassment claim on behalf of allegedly aggrieved persons is related to the allegations made in the original charges and arose out of Plaintiff's investigation of those charges.  The EEOC notified CPT that the allegations included "similarly situated women."  While the EEOC did not specifically identify those women by name in its correspondence, Defendant has cited no legal authority that such specific disclosure is a prerequisite to an exhaustion of the statutory prerequisites.  The EEOC has provided adequate notice to CPT of sexual harassment of similarly situated women.

> b. *Conciliation*

"The sufficiency of a conciliation effort by the EEOC does not present a jurisdictional question, so long as a conciliation

attempt has been made." *EEOC v. California Teachers' Ass'n*, 534 F.Supp. 209, 213, n. 3 (N.D. Cal. 1982) (citing *EEOC v. Zia Co.*, 582 F.2d 527, 533 (10th Cir. 1978). A district court's dissatisfaction with an EEOC conciliation attempt "is not the appropriate standard of review. The district court should only determine whether the EEOC made an attempt at conciliation. The form and substance of those conciliations is within the discretion of the EEOC as the agency created to administer and enforce our employment discrimination laws and is beyond judicial review." *EEOC v. Keco Industries, Inc.*, 748 F.2d 1097, 1101 (6th Cir. 1984). "The EEOC is under no duty to attempt further conciliation after an employer rejects its offer. Before bringing suit, the EEOC must make a good faith effort to conciliate the claim. However, once the employer rejects the conciliation attempts, the EEOC is free to file suit under Title VII." *Keco Industries*, 748 F.2d at 1101-1102 (citing *EEOC v. Radiator Specialty Co.*, 610 F.2d 178, 183 (4th Cir.1979); *EEOC v. Zia Co.*, 582 F.2d 527 (10th Cir.1978)). Where defendant "was unwilling to engage in any discussion regarding [a] charge . . .[,] the EEOC could reasonably have believed that its efforts to conciliate were sufficient." *EEOC v. Bruno's Restaurant*, 13 F.3d 285, 289 (9th Cir. 1993).

Here, applying a deferential standard of review to the EEOC's conciliation efforts, there is substantial evidence that the EEOC satisfied the statutory condition precedent of conciliation on behalf of allegedly aggrieved parties. The record indicates that the EEOC invited CPT to conciliate all of the claims against it, which necessarily included the sexual harassment charges levied by "similar aggrieved parties." (PSUF 3.) CPT received letters from

45

the EEOC providing notice that it had found reasonable cause to believe that similarly situated parties were subjected to sexual harassment while employed at CPT; (Doc. 37, Exh. 6 &7.) as part of settlement negotiations, the EEOC notified CPT that it would resolve the matter for $75,000; (PSUF 8.)  CPT made a counteroffer of $15,000, which the EEOC rejected;  (PSUF 8.)   And CPT was notified, on or about January 31, 2006, that the EEOC deemed conciliation efforts futile.  (Doc. 37, Exh. 8,9.)

During the conciliation, the EEOC provided more than sufficient information about the class and was not required to provide any additional detail.  *See EEOC v. Dial Corp.*, 156 F.Supp.2d 926, 942 (D. Ill. 2001) (EEOC's failure to identify class members during conciliation does not render its conciliation efforts inadequate).  The record is clear: the EEOC complied with its conciliation obligations by providing CPT with an opportunity to confront the sexual harassment charges brought by the similar aggrieved parties.

### c.    *Conclusion Re Allegedly Aggrieved Persons*

The EEOC satisfied the notice and conciliation prerequisites to proceed with a Title VII suit on behalf of allegedly aggrieved persons.   CPT has not opposed the remaining jurisdictional prerequisites regarding the EEOC's ability to bring a hostile work environment claim on Somera's behalf.  The EEOC's efforts satisfy Title VII.

The EEOC motion as to whether it satisfied the conditions precedent to bring a hostile work environment claim on behalf of similarly aggrieved persons is GRANTED.  CPT's motion for summary

1  adjudication in this regard is DENIED.

2

3  **B. Substantive Claims**

4      CPT moves for summary adjudication on each of Soares' claims:
5  (1) Soares' claim that she was subjected to a hostile work
6  environment; and (2) Soares' claim that she was retaliated against
7  for participating in federally protected conduct.

8

9      **1.   Soares' Hostile Work Environment Claim**

10     As described in Part VI(B), *supra*, to establish a hostile work
11 environment based on sex, the plaintiff must prove that she was
12 subjected to verbal or physical conduct, that the conduct was
13 unwelcome, and that the conduct was sufficiently severe or
14 pervasive to alter the terms and conditions of her employment and
15 create an abusive work environment.  *See Rene v. MGM Grand Hotel,*
16 *Inc*., 305 F.3d 1061, 1065 (9th Cir. 2002)(en banc).   The work
17 environment "must be both objectively and subjectively offensive,
18 one that a reasonable [woman] would find hostile or abusive, and
19 one that the [plaintiff] in fact did perceive to be so."  *Faragher*
20 *v. City of Boca Raton,* 524 U.S. 775, 787 (1998).

21     Whether the conduct is severe or pervasive is determined in
22 reference to the following factors: "the frequency of the
23 discriminatory conduct; its severity; whether it is physically
24 threatening or humiliating or a mere offensive utterance; and
25 whether it unreasonably interferes with an employee's work
26 performance."  *Kortan v. California Youth Auth*., 217 F.3d 1104 (9th
27 Cir. 2000)(internal quotations and citations omitted).     T h e
28 required showing of severity of the harassing conduct varies

inversely with the pervasiveness or frequency of the conduct. *See Ellison v. Brady*, 924 F.2d 872, 878 (stating "the strength of the claim depends on the number of incidents and the intensity of each incident.[20])

CPT contends that Soares' hostile work environment claim fails because the harassing conduct was neither severe nor pervasive. Plaintiff's counters that the verbal comments to which she was subject and the additional harassing conduct creates a triable issue that she experienced severe or pervasive sexual harassment that altered the conditions of her employment and created a hostile working environment. Although CPT urges that improper conduct does not rise to an actionable level, several Ninth Circuit cases in which a hostile work environment has been found to exist are reasonably similar to the circumstances of this case. At the very least, the precedents create a triable issue sufficient to survive summary adjudication.

In *Anderson v. Reno*, 190 F.3d 930 (9th Cir. 1999), an FBI agent endured a host of sexually harassing incidents between 1986 and 1994, including being referred to by her supervisor as the "office sex goddess," "sexy," "gorgeous," and "the good little girl" instead of by name. At a presentation she was to make about an arrest plan, finding an easel with a drawing of a pair of breasts and the words, "Operation Cupcake," and being told by the supervisor in front of the assembled group "This is your training

---

[20] However, to be actionable, the offensive conduct need not be both severe and pervasive, one or the other will do. Quantock v. Shared Mkntg. Services, Inc. 312 F.3d 899, 904 (7th Cir. 2002).

bra session."   The agent also received various vulgar notes including a cartoon depicting varieties of female breasts with her initials next to an example labeled "cranberries"; and being patted on the buttocks by another agent, who commented on her "putting on weight down there" and informed Anderson of his observations from time to time.

In another example, *Draper v. Coeur Rochester, Inc.*, 147 F.3d 1104 (9th Cir. 1998), a female employee of a mining company alleged that over a two-year period her supervisor made sexual remarks about her, in and out of her presence.   The supervisor frequently called her "beautiful" and "gorgeous" rather than her name and told her about his sexual fantasies, including his desire to have sex with her as well as his wife.   The supervisor also joked that the answer to a riddle about what a Mexican prostitute was called is "frijole" and several times remarked about Draper's "ass" and commented to others that "it would be fun to get into [Draper's] pants".   On one occasion the supervisor used the loudspeaker to ask whether Draper needed help changing clothes and said there were several guys willing to help, and on another, after Draper had taken off a sweatshirt, asked whether that was all she was going to take off.

*Montero v. AGCO Corp.*, 192 F.3d 856, 860 (9th Cir. 1999) further illustrates the type of conduct that gives rise to a hostile working environment.   Montero was the only female employee at a parts distribution center.   Over a two-year period, one supervisor called her a "butt-kiss," told Montero he was going to spank her, rested his chin on her shoulder, grabbed her arms until she said "ouch," and made crude gestures.   Another supervisor

49

grabbed his crotch while speaking with her, placed his face on her bottom, told her he had sexual dreams about her, put his hand on her chair as she sat down, tried to bite her neck, and knelt in front of her and tried to put his head between her knees.  Another employee had pulled her pants up from behind by the belt loop, commented about the small size of his penis, and placed notes on her desk telling Montero to dance naked on the desk or to take off her clothes.

There is no evidence or argument in this case that Soares was subject to any direct physical acts.  Soares' hostile work environment claim is based on verbal comments and actions taken by employees of CPT, specifically, Larry Fuentes.  However, Soares asserts that Fuentes' sexually-explicit comments in front of male psychiatric patients put her safety at risk.  Even so, a sexual harassment claim may be viable even though comprised solely of verbal harassment, with or without sexual advances.  *Lipsett v. Univ. of Puerto Rico*, 864 F.2d 881, 905 (1st Cir. 1988).

The earliest identified comment took place during Soares' orientation in October 2003.  During orientation, Fuentes, Soares' supervisor, showed her CPT's facilities and introduced her to the staff and patients.  Fuentes, in Soares' presence, asked a male psychiatric patient, "I bet you would like [Soares] to wash you in the shower, right?" (Soares Dep. 29:16-29:22.)  Fuentes then asked the patient, "you like her ass, don't you?"  The "like her ass" comment concerned Soares' buttocks.  (Soares Dep. 29:23-30:3.)

On more than one occasion during her employment, Fuentes told Soares about his tongue piercing.  (Soares Dep. 39:7-39:24.)  Fuentes stated that it was "to please the woman" and it made "women

feel good." (Soares Dep. 39:12-39:19.) Fellow CPT employees heard Fuentes' comments concerning his tongue ring. (*Id.*)

At unspecified points in time throughout her enmployment, Soares heard of Fuentes' sexual comments toward other CPT emloyees.[21] One employee told Soares that "she had squatted down [and] Fuentes want to know, you know, what it looked like." (Soares Dep. 73:15-73:19.)  Charging Party Somera also told Soares of her experiences Fuentes and his sexually-charged behavior. Specifically, Somera told Soares of her distress when Fuentes trapped her in the facility's freezer and stated "I want to see your nipples get hard."

Soares testified in her deposition that Soares constantly used the word "pussy" to describe female employees. (Soares Dep. 163:1-163:5.)  Soares stated that "[Fuentes] said that to me in referring [...] after he found that Della told him what I said about the shower incident."  (Id.)

At some point in time during her employment, Fuentes displayed a calendar of almost naked women on top of his desk.  Fuentes asked Soares, "that doesn't offend you, does it?" (Soares Dep. 66:19-66:24.)  The pictures were approximately 5x5 and were prominently displayed on his desk.  Fuentes' desk was located directly adjacent to the room where CPT held employee meetings.  (Soares Dep. 67:3-67:12.)  Soares observed Fuentes' calendar every shift, either on

---

[21] One who has been personally subject to sexual harassment may introduce evidence of the harasser's sexual misconduct toward others, of which she becomes aware during her employment, even if the other acts occurred outside of the Plaintiff's presence. *Hawkins v. Anheuser-Busch, Inc.*, 517 F.3d 321, 335 (6th Cir. 2008); *Weeks v. Baker & McKenzie,* 63 CA 4th 1128, 1160-1163 (1998).

1   the way to staff meetings or to work at the meeting table.   (Soares
2   Dep. 67:10-67:12.)

3        There are also Fuentes' comments to a male psychiatric patient
4   in March of 2004.   Soares agreed to take a male pychiatric patient
5   on a smoke break if he took a shower.   (Soares Dep. 53:7-55:12.) To
6   the best of Soares' knowledge, the patient did so.   On their way to
7   the smoking area, Fuentes challenged the patient's shower claims
8   and stated that, "well, have [Soares] smell your balls to see if
9   you took a shower."   (Id.)   The patient responded, "that's messed
10  up."   Soares complained to the head nurse, Mr. Baker, who had
11  witnessed the episode.   (Id.)   Soares told Baker that Fuentes'
12  comments threatened to her physical safety, as she was often alone
13  with male patients during her evening shift.[22]   (UF 42.)

14       Although this case lacks the level of misconduct contained in
15  the most egregious cases, Soares experienced much more than one
16  isolated incident.   Soares has identified a continuing pattern of
17  sexually unwelcome comments far exceeding the comments found in
18  *Smith v. County of Humboldt*, 240 F. Supp. 2d 1109 (N.D. Cal. 2003),
19  the case relied on by CPT.   Overt sexual comments that females were
20  "pussies" and offers to male psychiatric patients that female
21  nurses would "wash them in the shower" and "smell their balls,"
22  were a continuing part of Plaintiff's workplace.   A reasonable

23

24       [22] CPT argues that "Ms. Soares did not perceive the shower
25  incident as subjectively offensive by reason of sex.   Instead,
    she was concerned because the remark was made in the presence of
26  a mental patient."   CPT's arguments miss the mark.   "Rude,
    overbearing, loud vulgar and generally unpleasant comments by a
27  male supervisor toward female subordinates" may constitute sexual
    harassment under certain circumstances.   *EEOC v. National Ed.
28  Ass'n , Alaska*, 422 F.3d 840, 845 (9th Cir. 2005)

woman would, like Soares, find them offensive.

CPT also cites *Sanchez v. City of Santa Ana*, 936 F.3d 1027 (9th Cir. 1990) as an example of case where harassing conduct was not enough to create a hostile work environment. *Sanchez*, however, is not altogether helpful.  The court did not specify the nature of the "racially offensive slurs" or the "racially offensive" "cartoon" in the case or otherwise elaborate on the nature of the harassing incidents. *Id*. The court described the incidents in generic terms and often referred to what was "alleged" or "claim[ed]." *Id.* at 1031.  The hostile work environment claim was tried in a bench trial and the district court granted a motion for judgment in favor of the defendant. In affirming the judgment, the court did not provide an extended analysis of the hostile work environment claim.  The court simply stated: "We cannot say that the district court's ultimate conclusion, that the plaintiffs failed to prove the existence of a discriminatory atmosphere, is incorrect as a matter of law."  *Id*. at 1037.  Absent more information about the nature of the incidents involved, the conduct, and an articulated analysis as to why the hostile work environment claim failed, the value of *Sanchez* is minimal and is unhelpful in resolving this motion.

Here, Soares has provided evidence of numerous harassing and offensive incidents that occurred over her seven-month employment at CPT. In terms of frequency, "[w]hile a hostile work environment claim may be stronger where it is based upon repeated incidents, the pervasiveness of the conduct that must be shown to prevail on a hostile work environment claim varies inversely with the seriousness of the incidents." *Ellison v. Brady*, 924 F.2d 872,

880-81 (9th Cir. 1991).  And "[w]ithin the totality of circumstances, there is neither a threshold 'magic number' of harassing incidents that gives rise, without more, to liability as a matter of law nor a number of incidents below which a plaintiff fails as a matter of law to state a claim." *Rodgers v. Western-Southern Life Ins Co.*, 12 F.3d 668, 674 (7th Cir. 1993).

CPT suggests that these acts were nothing more than a "handful of minor allegations," (Def's Reply at pg. 9), but that is a question for the jury.[23]  A reasonable jury considering all the evidence could find that the actions and comments of Larry Fuentes were offensive sexual harassment and sufficiently pervasive to be actionable. *See Ellison v. Brady*, 924 F.2d 872, 880-81 (9th Cir. 1991) ("Sexual harassment is a major problem in the workplace. Adopting the victim's perspective ensures that courts will not sustain ingrained notions of reasonable behavior fashioned by the offenders.") Construing the evidence in EEOC's favor, the non-moving party, there is a triable issue as to whether Soares' work environment was sufficiently hostile to violate Title VII.

CPT's motion on Soares' hostile work environment claim is DENIED.

### 2. Soares' Retaliation Claim

The EEOC claims that CPT retaliated against Somera for complaining about sexual harassment by Mr. Fuentes.  CPT counters that the EEOC has not established a prima facie case of retaliation

---

[23] Displays of offensive materials may contribute to a hostile environment. *Lipsett v. Univ. of Puerto Rico,* 864 F.2d 887.

nor proffered evidence demonstrating CPT's allegedly adverse employment actions were a pretext for unlawful retaliation.

To make out a prima facie case of retaliation, an employee must show that (1) he engaged in a protected activity; (2) his employer subjected him to an adverse employment action; and (3) a causal link exists between the protected activity and the adverse action. *See Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1464 (9th Cir. 1994). Causation "may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987); *see also Flait v. No. American Watch Corp.*, 3 Cal. App.4th 467, 478, 4 Cal. Rptr. 2d 522 (1992) (reversing judgment for employer on motion for summary adjudication where circumstantial evidence of causal link raised issue of fact).

Once plaintiff produces evidence supporting a prima facie case, the burden shifts to the defendant employer to articulate a legitimate, non-retaliatory reason for the adverse employment action. Once the employer articulates such a reason, a plaintiff bears the burden of demonstrating that the reason was merely a pretext for the unlawful retaliatory motive. *Stegall v. Citadel Broad. Co.*, 350 F.3d 1061, 1066 (9th Cir. 2003). A plaintiff can prove pretext with either direct or indirect evidence. If a plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial. When direct evidence is unavailable, however, and the plaintiff proffers only

circumstantial evidence that the employer's motives were different from its stated motives, specific and substantial evidence of pretext is required to survive summary judgment. *See id*. (citing *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998)).


### A. <u>Prima Facie Case</u>

CPT argues that the EEOC cannot establish a prima facie case for retaliation fails because Somera did not engage in protected activity.  CPT also argues that there is no casual nexus between Somera's alleged complaints and Mr. Drayton's decision to terminate her.

### 1. *Protected Activity*

As noted above, Soares must demonstrate as part of her prima facie case that she participated in a statutorily protected activity. "An employee has engaged in activity protected by Title VII if she has either (1) 'opposed any practice made an unlawful employment practice' by Title VII or (2) 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing' under Title VII." *Grimes*, 102 F.3d at 140 (citing 42 U.S.C. § 2000e-3(a); *Long*, 88 F.3d at 304).  For example, an employee's filing of a discrimination charge with external agencies has been recognized as a "protected activity." *See United States v. New York City Transit Auth.*, 97 F.3d 672, 677 (2d Cir.1996).  Likewise, picketing an employer to protest its failure to provide employment opportunities for minorities is a protected activity.  *See Payne*, 654 F.2d at 1137. Similarly, sending letters protesting unspecified "racism" and "discrimination" by an employer also constitutes protected

activity.   *See EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1012-13 (9th Cir.1983); *Sias v. City Demonstration Agency*, 588 F.2d 692, 695-96 (9th Cir.1978).   Further, making complaints to an officer of a company about discriminatory practices is a protected activity.   *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1178 (2nd Cir.1996); accord Robinson v. Pinnacle Brands, Inc., No. 95-CV-689, 1997 WL 102478, at *8 (N.D.Tex. Feb.28, 1997); *Harker v. Utica College of Syracuse Univ.*, 885 F.Supp. 378, 385 (N.D.N.Y.1995); *Arzate v. City of Topeka*, 884 F.Supp. 1494, 1503 (D.Kan.1995).   As the Second Circuit has stated:

> In addition to protecting the filing of formal charges of discrimination, § 704(a)'s opposition clause protects as well informal protests of discriminatory practices, including making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges.

*Sumner v. United States Postal Serv.*, 899 F.2d 203, 209 (2nd Cir. 1990).

Soares claims that she engaged in protected activity in March 2003, which led to her eventual dismissal from CPT in April 2003. Specifically, Somera claims that she reported a number of Fuentes' offensive comments to Nurse McClendon and Nurse Baker in March 2003.   Such comments included complaining about being told by Fuentes to smell a patient's private parts, something Soares thought was offensive and put her in danger.   Soares also asserts that her unsuccessful attempts to get in touch with Mr. Drayton constituted protected activity.

Here, Soares' opposition was directed at sexually explicit

comments made by Fuentes in the presence of a patient.   Soares
complained to a nurse, Della McClendon, whom she viewed as a
supervisor and someone who could potentially discuss the situation
with Fuentes.   Soares' deposition testimony demonstrates this
point:

> Q.   When you first told Della about Mr. Fuentes'
> comment, what was her reaction, if any?
>
> [...]
>
> A.   When I told her about this incident. She went
> to Larry with it and told him that he offended me.
> Because I felt like I was actually talking to her
> as a supervisor.   I told her, 'If he says things
> like that to me in front of male patients when I'm
> going into their rooms at night sometimes by
> myself, they're not going to take me seriously and
> I could get hurt.'
>
> Q.   Okay.   And so you were talking to Della as a
> supervisor?
>
> A.   As – right.   I'd never been in the situation
> of these things before.

(Soares Dep. 57:8-57:25.)

Soares also complained about Fuentes to another nurse, David
Baker, who witnessed the shower incident.   The record demonstrates
that Soares' complaints to Nurse Baker were specific and apprised
him of Fuentes' comments and why she believed they were
discriminatory and presented safety concerns.

CPT does not dispute that Soares complained to Nurse McClendon
and Baker; rather, CPT minimizes Soares' complaints to Nurses
McClendon and Baker, arguing that they do not demonstrate that
Soares engaged in "protected activity."   In effect, CPT states that

1 Soares' complaints to Nurses Baker and McClendon are irrelevant
2 because they were not in her direct chain of supervision.[24]

3    CPT's arguments are not controlling.  Taking the evidence in
4 a light most favorable to Soares, there remains a genuine issue of
5 material fact as to whether she engaged in protected activity.
6 First, Soares' complaint to Nurse McClendon is arguably protected
7 activity because McClendon relayed it to Fuentes - her direct
8 supervisor.  Per CPT policy, this was the appropriate route to file
9 a sexual harassment complaint and Fuentes was obligated to report
10 it to management.[25]   Second, Soares' formal complaint path was
11 compromised:  the object of Soares' complaint, Fuentes, was her
12 *direct* supervisor and had previously harassed her on CPT property.
13 The record also demonstrates that CPT management was aware of
14 Fuentes' behavior toward women; nevertheless, Fuentes continued to
15 supervise female employees and was responsible for reporting sexual
16 harassment complaints to CPT management.  According to Soares, this
17 led to an erosion of employee trust concerning their complaints
18 about Fuentes and, taking the evidence in her favor, supports her
19 reasons for complaining to supervising nurses.

21   [24]  CPT argues that Soares merely "complained to a co-worker
22 about the shower incident" and "did not report the shower
incident to Mr. Drayton or Ms. Kelly."  (Doc. 40 at 11:23-12:2.)

24   [25] Fuentes testified in his deposition that "I had said
something to Valerie in the morning.  And after I said it, I knew
25 I hadn't have said it.  The following day I apologized to her for
saying it."  (Fuentes Dep. 62:8-62:12.)  Aware that his comments
26 to Soares were inappropriate, Fuentes - as MHW lead supervisor -
had an obligation to report the incident to management.  CPT's
27 Sexual Harassment policy states: "Any incidents of harassment
must be immediately reported to a manager or management
28 representative."  (CPT Employee Manual, CPT0315.)

1    Further, although nurses and MHW's treated patients together,

2 nurses were organizationally superior to MHW's and gave them orders

3 concerning patient care.[26]   Nurse Baker's deposition testimony

4 demonstrates why it was reasonable for Soares to complain about

5 Fuentes to the nursing staff, especially a nurse supervisor:

6
7       Q.   Do you know if [Fuentes] was [Soares'] direct
             supervisor?

8       A.   He may have been at [the time of the shower
             incident]
9
        Q.   Okay.  And the protocol, according to the policy,
10           was complain first to your immediate supervisor,
             and then obviously in this case she cant be
11           complaining to him.  Who would be the next person
             according to the protocol she should complain to?
12
        A.   The administrator or program director.
13
        Q.   Or director of nurses?
14
        A.   Yes.
15
        Q.   All right. And were you – did you tell the EEOC
16           investigator in your conversation with her that
             you were shift supervisor at the time.
17
        A.   I was charge nurse.
18
        Q.   Is that the same thing?
19
        A.   Yeah.  I would be considered a supervisor, yes.
20
        [...]
21
        Q.   And it's your duty to make those sorts of reports?
22
        A.   Yes.
23
        Q.   Okay.  Did you consider that comment from Mr.
24           Fuentes violated sexual harassment policy?
25

26      [26]   Soares stated in her deposition that McClendon was
27 superior to her and, being a nurse, she could give her orders.
   (Soares Dep. 38:8-38:20.)   Soares stated this was the case even
28 though Fuentes was her direct supervisor.   (*Id.*)

60

**A.    Yes.**

**(Baker Dep. 49:4-50:5.)**

There are sufficient facts in the record upon which a jury could find that Soares' complaints to Nurses McClendon and Baker constituted protected activity.  In *EEOC v. Crown Zellerbach Corp.*, 720 F.2d 1008, 1013, the Ninth Circuit stated that it must be possible to discern from the context of the statement that the employee opposes an unlawful employment practice.  Soares satisfies this standard.  Her comments were specific and apprised Nurses McClendon and Baker of particular practices she viewed as discriminatory.  Although Soares did not complain to her direct supervisor - per CPT policy - she did complain to supervisory-level employees with whom she "felt comfortable."[27]  Soares complained to two nurses - one a direct charge nurse - about Fuentes' statements, and the record supports this.  Moreover, Nurse McClendon told Fuentes his comments offended Soares and he did not report the incident - a violation of CPT policy.  CPT provides no authority supporting the argument that such complaints, under the unique circumstances presented, are not sufficient to create a genuine issue of material fact.

It is also reasonable to infer that Soares' attempts to contact Drayton constituted protected opposition activity.  Soares provided evidence reasonably warranting an inference that she complained to Drayton, CPT's Director, about Fuentes' sexually

---

[27] CPT policy stated that employees "must report [harassment] to their immediate supervisor or the designated management representative with whom they feel comfortable."

explicit "shower tirade" and his continued sexual harassment of CPT employees.  At the very least, Drayton had knowledge of the shower incident - pursuant to an anonymous Department of Mental Health Complaint - and likely inferred that Soares was the one who complained to the Department of Mental Health.

Balancing all applicable factors, the EEOC's evidence is enough to create a genuine issue of material fact.  CPT has not met its Rule 56 burden and demonstrated, as a matter of law, that Soares did not engage in protected activity under Title VII.

CPT's motion for summary adjudication regarding Soares' claim for retaliation is DENIED.

### 2.  *Causal Connection*

For the first time in its reply papers, CPT argues that Soares' does not establish a prima facie case for retaliation because there is no "causal nexus" between CPT decision-makers and Soares' complaints about Fuentes.  In its opening motion, CPT argued that Soares' did not establish a prima facie case because Soares did not engage in a protected activity.  CPT did not argue, as it does in its reply papers, that Soares' claim fails because the CPT decision-makers did not "have actual knowledge of the protected activity in order for its decisions to be retaliatory." (Def.'s Rep. 2:3-2:5.)

A moving party's attempt to introduce new facts or different legal arguments in reply papers is improper.  *See Lujan v. National Wildlife Federation*, 497 U.S. 871, 894-895, 110 S.Ct. 3177, 3192 (1990) (court has discretion to disregard late-filed factual matters); *see also Glenn K. Jackson v. Roe*, 273 F.3d 1192,

62

1201-1202 (9th Cir. 2001) (district court's discretion to consider issue raised for first time in reply brief); *Jackson, Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir.2001) (stating a district court "may grant summary judgment on any legal ground the record supports."). The "causal nexus" argument is new to CPT's reply papers and is disregarded.  The argument will not be considered as part of CPT's motion for summary adjudication.[28]

### B.   Legitimate Business Reason

CPT has set forth ample evidence to support its proffered legitimate reason for Soares' termination: her sleeping during her shift.  Failure to perform in accordance with standards set by the employer is sufficient to constitute a legitimate business reason for termination.  *See Unt v. Aerospace Corp.*, 765 F.2d 1440, 1446 (9th Cir. 1985) (holding that Title VII does not protect employee who violates employer's rules, disobeys orders and disrupts the work environment); *Mansur v. Peralta Community College Dist.,* 216 F.3d 1083 (9th Cir. 2000).  The record contains direct evidence that Soares slept during her April 9, 2004 shift, a violation of

---

[28] To survive summary judgment, Plaintiff "must make some showing sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had engaged in protected activity." *Raad*, 323 F.3d 1185, 1197; *see also Dey v. Colt Const. & Dev. Co.*, 28 F.3d 1446, 1458 (7th Cir. 1994) (stating, in a Title VII case, that a plaintiff "may rely on circumstantial evidence to establish her employer's awareness of protected expression" and the plaintiff must "produce evidence that would support an inference that Irsay [a decision-maker] was . . . aware" of the "sexual harassment complaints").  The EEOC satisfies this burden.  When construing the evidence in a light most favorable to Plaintiff, a genuine issue of material fact remains as to the causal connection between the alleged protected activity and the adverse employment action.

1  CPT policy. (Drayton Dep. 43:6-37:17.) The record also
2  demonstrates that Soares knew of the policy prior to April 9, 2004.
3  (Soares Dep. 65:13-65:16.)  CPT has met its burden of demonstrating
4  legitimate business reasons for terminating Soares' employment.

5

6       C.   **Pretext**

7       CPT met its burden of offering legitimate, nondiscriminatory
8  reasons for its actions.   Therefore, the burden shifts back to
9  Plaintiff to prove that this reason was merely pretextual.
10 Plaintiff can do so by either showing that the articulated reason
11 is "unworthy of credence" or that a discriminatory motive more
12 likely motivated Defendant. *Villiarimo v. Aloha Island Air, Inc.*,
13 281 F.3d 1054, 1062 (9th Cir. 2002). A plaintiff may rely on
14 circumstantial evidence to show pretext, but the evidence must be
15 both specific and substantial.   *Id*.

16      The EEOC offers circumstantial evidence to show that CPT's
17 explanations for Soares' termination are pretextual. Specifically,
18 the EEOC presents relatively strong evidence based on timing, as
19 Soares' discharge occurred five weeks after her complaints to
20 nurses regarding the shower incident and a few weeks after her
21 repeated attempts to contact Drayton.   The EEOC also demonstrates
22 CPT's lack of consistency to follow internal policies regarding
23 CPT's "no sleeping policy" and questions whether the sleeping
24 policy applies to MHW's.   Soares argues that she was not sleeping
25 during her shift and that Steele's "surprise visit" was meant to
26 create a for-cause dismissal.

27      CPT, however, has offered strong evidence that Plaintiff's
28 termination was based on legitimate, nondiscriminatory factors --

**64**

namely, that Plaintiff was discharged for sleeping during her shift, which occurred after the shower incident and less than 24 hours prior to Soares' dismissal.  The EEOC has some evidence that the sleeping policy was not consistently applied.  However, although the question is a close one, on balance, the EEOC has pointed to enough evidence of pretext in the form of the timing, circumstances of the discharge, and inconsistent application of internal policies to survive summary judgment.

The EEOC's circumstantial evidence is sufficient to raise a genuine issue of material fact because it demonstrates that an illegitimate reason more likely than not motivated CPT, or was at least a motivating factor in Soares' dismissal.

CPT's motion for summary adjudication as it relates to Soares' claim for retaliation is DENIED.

C. <u>Punitive Damages</u>

42 U.S.C. § 1981a(b)(1) provides that punitive damages may be recovered "if the complaining party demonstrates that the respondent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual."  The Supreme Court found that the employer's behavior need not have to be "egregious" to meet this standard.  *Kolstad v. Am. Dental Assoc.*, 527 U.S. 526, 534-35 (1999).  Instead, punitive damages will be awarded in cases of intentional discrimination where an employer discriminates in the face of a perceived risk that its actions will violate federal law.  *Id*. at 534.  The terms "malice" and "reckless" focus on the employer's state of mind, that is, its

knowledge that it may be acting in violation of federal law. *Id*.

There are some instances in which intentional discrimination will not give rise to punitive damage liability.  *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 515 (9th Cir. 2000).  First, if the theory of discrimination advanced by the plaintiff is sufficiently novel or poorly recognized, then the employer could believe its action was legal. *Id*. Second, if the employer believed it had a valid bona fide occupational qualification (BFOQ) defense to its conduct.  *Id*.  Third, in some situations, albeit rare, the employer could actually be unaware of Title VII's prohibition against discrimination.  *Id*.

In addition to meeting this standard, the plaintiff must also impute liability for punitive damages to the employer. *Hemmings v. Tidyman's, Inc.*, 285 F.3d 1174, 1197 (9th Cir. 2002).  This can be done through traditional agency principles, e.g., "that a managerial employee acted within the scope of his or her employment." Id.

An affirmative defense to punitive damage liability exists where the defendant shows its good faith efforts to comply with Title VII, "if such efforts were contrary to the actions of its managerial agents."  Id. at 1197-98.  Not only must the employer show it has an antidiscrimination policy, but that it has implemented the policy in good faith. *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 517 (9th Cir. 2000). The purpose of Title VII would be "undermined if those policies were not implemented and were allowed instead to serve only as a device to allow employers to escape punitive damages for the discriminatory activities of managerial employees." Id.

1    <ins>     1.    Soares' Punitive Damage Claim</ins>

2         CPT submits that even if Fuentes' conduct is found to be

3    actionable, it is entitled to summary judgment on Soares' punitive

4    damages claim because "EEOC is unable to establish that CPT 'almost

5    certainly knew' of Mr. Fuentes' alleged misconduct at the time Ms.

6    Soares was terminated for sleeping on the job."  (Doc. 40, 17:22-

7    17:23.)  CPT's assertion is inconsistent with the record.

8         The record indicates that Drayton knew about Fuentes' comments

9    to Soares during the aforementioned shower incident.  Although it

10   was presented as a patient care issue, Drayton knew about Fuentes'

11   comments and interviewed Fuentes and the patient concerning the

12   incident.  He did not interview Soares.  Drayton testified at his

13   deposition:

14            Q: Your testimony indicated that because you learned
              about this episode through the Department of Mental
15            Health, you treated it as a patient violation as
              opposed to like a sexual harassment violation.  Do you
16            recall that testimony?

17            A: Yes, I do

18            Q: What exactly was entailed in investigating it as a
              patient violation?
19
              A: I spoke to the patient involved and I asked them
20            what had happened, was he offended by it, did he feel
              that he was being treated in a manner outside of the
21            standard of care.  And did he want to speak with - did
              he want to speak with Larry directly and did he want
22            an apology from Larry.

23            Q: Did he want an apology from Larry?

24            A: No.  I do not believe it was that big of a deal.

25            [...]

26            Q: Did you do anything else in connection with
              investigating this episode as a patient violation?
27
              A: Yes.  I made a call to the Department of Mental
28            Health and explained to them what I had found and they

                                 67

1
2
3

> had told me at the time that they did not feel that
> although it was unfortunate that it had happened, that
> it was handled to their satisfaction and did not rise
> to the level of citation.

4  **(Drayton Dep. 285:1-286:6.)**

5
6
7

The EEOC argues a material dispute exists because "Drayton did nothing to investigate the matter as a potential sexual harassment policy violation." (Pl.'s Opp. 30:26-30:28.) In essence, the EEOC argues that CPT was on notice of the harassing event and chose to look the other way, classifying the incident only as a "patient safety issue." The EEOC argues that this was not the first time CPT looked the other way; that CPT continually disregarded harassment complaints against Fuentes. The EEOC contends that CPT's conduct creates a genuine issue of material fact as to its claim for punitive damages. This argument has merit.

Drayton's deposition testimony demonstrates that he knew about Fuentes' sexually-charged comments to Soares; that he investigated the incident as a patient care issue even though it involved explicit sexual language and a repeat perpetrator of sexual harassment - whose actions prompted sexual harassment in-service training in November 2003. The record further indicates that Mr. Omoregie - the Department of Mental Health's representative - contacted Drayton prior to the shower incident to provide a "chronology" of sexual harassment complaints involving Larry Fuentes. This context is critical to the inquiry:

> A.   Mr. Omoregie asked me to give him a chronology of
>      what was going on with Larry because they had
>      received some complaints about him and he wanted
>      me to make sure that we were doing things to

1

2

> safeguard the residents.  If the things that he
> was being attributed of doing were true, he
> wanted to know what our global efforts were.

3

4

> Q.    Okay.  Do you know — so Mr. Omoregie had received
> some complaints about Fuentes.  Do you know what
> those complaints were?

5

6

7

> A.    He had gotten several complaints via telephone,
> their hot line that some where of a sexual
> nature, some of them were patient care nature
> [...]

8

**(Drayton Dep. 444:7-444:19.)**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

     **Drawing the inferences in the EEOC's favor, Drayton's
explanation regarding the limited scope of his investigation
undermines CPT's motion for summary adjudication and creates an
inference that CPT was inconsistent, careless, and reckless
concerning sexual harassment at CPT.  Although the Department's
jurisdiction is limited to patient and licensing issues, that does
not provide CPT with an unrestricted mandate to ignore a number of
incidents of sexual harassment, especially when they involve a
repeat offender.[29]  CPT's conduct comes under additional scrutiny
given that it knew about Fuentes' continued improper interactions
with female employees and Mr. Omoregie previously requested
Fuentes' sexual complaint history.  In sum, Drayton's actions are
suspect - rather than consistent with regulatory compliance - and
create a genuine dispute of material fact as to whether or not
CPT's conduct in this regard was malicious, recklessly indifferent
or oppressive by ratifying Fuentes' continuing harassing conduct.**

26

27

28

     [29] At the very least, Drayton should have interviewed Soares
as a percipient witness to the incident.  CPT's Sexual Harassment
Policy states: "Appropriate investigation and disciplinary action
will be taken."  (Doc. 41, Exh. B at CPT0315.)

As explained above under "Pretext," a rational trier of fact could infer that CPT terminated Soares because she complained that her rights against sexual discrimination were being violated.  This is sufficient for malice under Title VII.  *Ezell v. Edwards Theatres, Inc.*, 2006 WL 3782698 at *20 (E.D. Cal. 2006).  It is true that mere evidence of an intentional violation has been held insufficient, but the showing required beyond the threshold level of intent required for compensatory liability is wilful and egregious conduct, or conduct that displays reckless indifference (and not mere negligence) to the Plaintiff's federal rights such that the defendant almost certainly knew that what he was doing was wrongful and subject to punishment. Ngo v. Reno Hilton Resort Corp., 140 F.3d 1299, 1303-05 (9th Cir.1998), amended 156 F.3d 988, 988-89 (9th Cir.1998) (holding that merely negligent calculations with respect to taking leave did not support punitive damages). The evidence in this case is sufficient to raise an issue of fact as to whether or not CPT's conduct was malicious, recklessly indifferent to known federally protected rights of Soares, and oppressive.

CPT's motion for summary adjudication is DENIED as to Soares' claim for punitive damages.

### 2.   Somera's Punitive Damage Claim

CPT argues that punitive damages are not available in this case because it made good faith efforts to comply with Title VII by having a policy against sexual harassment, investigating the claims of harassment, disciplining the harasser, and providing in-service sexual harassment training.

70

1     The EEOC submits there is substantial evidence creating a
2  genuine issue of material fact.   This includes that CPT did not
3  appropriately respond to Somera's allegations, including her
4  repeated complaints to Sherry Wall and other supervisors and
5  employees.   Additionally, CPT's managers, Wall and McGowan, had
6  knowledge of Fuentes' serial sexual misconduct and did not respond
7  for eight months.   CPT never effectively punished Fuentes for his
8  conduct, seemingly condoning his behavior.   Plaintiff asserts other
9  evidence that Drayton omitted any reference to Somera's sexual
10 harassment complaints when asked to detail episodes of Fuentes'
11 potentially inappropriate behavior.

12     An affirmative defense exists to punitive damage liability
13 when an employer has a bona fide policy against discrimination and
14 did not ignore Plaintiff's complaint.   Defendant did have an
15 anti-harassment policy and Somera knew of the policy.   But this is
16 not the end of the inquiry.   There was testimony that sexual
17 harassment training was illusory.   Specifically, according to
18 Somera, Fuentes - the individual whose harassment brought on the
19 in-training - talked on the telephone the entire time and did not
20 pay attention.   (Somera Dep. 138:9138:17.)   The record also
21 contains testimony that Fuentes actually conducted a portion of the
22 sexual harassment in-training.   (Soares Dep. 77:19-77:24.)   The
23 employer must show it implemented its policy in good faith. *See*
24 *Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d
25 493, 517 (9th Cir. 2000).   It must be shown that CPT made efforts
26 to implement its policy, through education of its employees and
27 active enforcement of its mandate.   *See Lopez v. Aramark Uniform &*
28 *Career Apparel, Inc.*, 426 F. Supp. 2d 914, 964 (N.D. Iowa 2006).

71

Even if an employer adduces evidence showing it maintains on paper a strong non-discrimination policy and makes good faith efforts to educate its employees about that policy and Title VII, an employee may still recover punitive damages for sexual harassment by demonstrating the employer failed to adequately address Title VII violations of which it was aware. *Cadena v. Pacesetter Corp.*, 224 F.3d 1203, (10th Cir. 2000).

After reviewing the evidence in a light most favorable to Plaintiff, there is sufficient evidence that CPT acted in the face of this awareness by ignoring Somera's complaints, not disclosing Fuentes' history of harassment, and giving Fuentes a meaningless warning for his repeated use of sexually-charged language and touching female employees. *See Rowe v. Hussmann Corp.*, 381 F.3d 775, 784 (8th Cir. 2004) ("Recklessness and outrageousness may be inferred from evidence of management's participation in the discriminatory conduct or where an employee's repeated complaints to supervisors fall on deaf ears.") (internal citations and quotation marks omitted).

A jury must decide whether CPT engaged in good faith efforts to comply with Title VII.

CPT's motion for summary adjudication is DENIED as to Soares' claim for punitive damages.

## VI. CONCLUSION.

A.   Jurisdictional Prerequisites.

For the reasons discussed above:

1. The EEOC's motion as to whether it satisfied the conditions precedent to bring suit on behalf of charging party Soares is

72

GRANTED.

    **2. The EEOC motion as to whether it satisfied the conditions precedent to bring a hostile work environment claim on behalf of charging party Somera is GRANTED.   CPT's motion for summary adjudication in this regard is DENIED.**

    **3. Summary adjudication is GRANTED in favor of CPT regarding the EEOC's ability to bring a constructive discharge claim on Somera's behalf.   The EEOC's motion in this regard is DENIED.**

    **4. Given the ruling on Somera's constructive discharge claim, it is unnecessary to decide the motions regarding whether the EEOC satisfied the statutory prerequisite to conciliate.   The EEOC's and CPT's motions regarding the statutory prerequisite to conciliate are DENIED as MOOT.**

    **5. Summary adjudication is GRANTED in favor of the EEOC regarding its ability to bring a hostile work environment claim on behalf of allegedly aggrieved persons.   CPT's motion in this regard is DENIED.**


**B.    Substantive Claims.**

    **For the reasons discussed above:**

    **1. CPT's motion on Soares' hostile work environment claim is DENIED.    Construing the evidence in EEOC's favor, there is a triable issue as to whether Soares' work environment was sufficiently hostile to violate Title VII.**

    **2. CPT's motion for summary adjudication on Soares' retaliation claim is DENIED.   The EEOC established a prima facie case for retaliation and CPT demonstrated a legitimate business reason for Soares' termination.   However, the EEOC's evidence is**

sufficient to raise a genuine issue of material fact as it demonstrates that an illegitimate reason more than likely motivated CPT, or was at least a motivating factor in Soares' dismissal.

3. CPT's motion for summary adjudication as to Soares' punitive damage claim is DENIED. The evidence is sufficient to raise an issue of fact as to whether or not CPT's conduct was malicious, oppresive, or recklessly indifferent to known federally protected rights of Soares.

4. CPT's motion for summary adjudication as to Somera's punitive damage claim is DENIED. A jury must decide whether CPT engaged in good faith efforts to comply with Title VII.

Plaintiff shall submit a form of order consistent with this memorandum decision within five (5) days of electronic service.

IT IS SO ORDERED.

Dated:   July 31, 2009                       /s/ Oliver W. Wanger
                                             UNITED STATES DISTRICT JUDGE